JOSEPH A. SMITH, TRUSTEE, vs. EBENEZER H. GAYLORD AND OTHERS.

A joint stock corporation owning and operating a brewery, with a capital of $113,000, had for its principal stockholders and directors A, B and C. A personal disagreement occurring between A and B, and it being for the interest of the company that one of them should leave it, A agreed to sell his stock to B and C, and they to take it, for $20,000, and the corporation, by unanimous vote of the directors, conveyed its brewery to B and C, who made their joint note to A for $20,000 and secured it by a mortgage of the brewery, after which they conveyed their equity of redemption to the corporation, the latter having thus furnished the security for the note. Both deeds were at once put on record. The company at this time was largely solvent after deducting the amount of the mortgage from its assets, the business was done under the advice of counsel, and there was no intent to defraud creditors, the whole object being to promote the interests of the company; but the company was at this time making some loss in its business and two and a half years after went into insolvency. On a petition by the trustee in insolvency to set aside the mortgage, it was held—

1. That there was no fraud in law.
2. That the arrangement was one that the corporation had power to make.
3. That subsequent creditors could not set it aside, both because there was no intent to defraud creditors and because they had record notice of the mortgage.

BILL IN EQUITY to set aside a mortgage; brought to the Superior Court, and reserved, on a finding of the facts, for the advice of this court. The case is sufficiently stated in the opinion.

*T. E. Doolittle* and *C. S. Hamilton*, for the petitioner.

*C. R. Ingersoll*, for the respondents.

PARDEE, J. The petition of Joseph A. Smith, trustee in insolvency of the estate of the Burton Brewing Company, a joint stock corporation, alleges in substance that John J. Phelps, Seth F. Benton and Ebenezer H. Gaylord, stockholders therein, combined to defraud its creditors, the said Phelps and Benton by giving, and the said Gaylord by taking and recording, a fraudulent mortgage upon its property for $20,000; asking for a decree compelling Gaylord to convey to the petitioner for the benefit of creditors the interest

acquired by the mortgage. Upon this petition Gaylord was temporarily enjoined against making any other transfer of the property. The case is reserved upon a finding of the facts for the advice of this court.

In January, 1873, the joint stock corporation, the Burton Brewing Company, having been organized, it succeeded to and continued the business of brewing ale theretofore carried on by John J. Phelps, E. H. Gaylord and Seth F. Benton as partners, in New Haven. Its capital was $113,200, in eleven hundred and thirty-two shares, of which Phelps owned one half and Gaylord and Benton each one-fourth. This owner-ship remained until 1875, when Benton transferred five shares to his daughter, the wife of Phelps, and one share to his step-son, James P. Seeley. For the years 1873 and 1874 its busi-ness was profitable; for the year 1875 the loss amounted to about $7,300; for the years 1876-7-8 the loss was continuous, and insolvency overtook the company in October, 1878. This resulted from increased competition in business, increased consumption of lager beer, and the sickness of Phelps. In the summer of 1875 personal differences arose between Phelps, who was the general manager of the business, and Gaylord, who was the superintendent of the brewing depart-ment, and being unable to work harmoniously together each determined not to continue in business with the other. Con-sequently in December, 1875, Gaylord offered either to buy Phelps's half for $40,000 or sell his own fourth to him for $20,000, the payment in either case to be secured by a mort-gage upon the brewery. In January, 1876, Phelps accepted Gaylord's offer to sell his stock, and each consulted counsel as to the manner in which the specified security should be given. It was afterwards arranged that the stock should be taken by Phelps and Benton together. On the 4th day of February, 1876, at a meeting of the directors of the company at which all were present, a vote was unanimously passed authorizing James P. Seeley, one of their number, for and in behalf of the corporation, to sell and convey by a good and sufficient deed of warranty to John J. Phelps three undivided fourths, and to Seth F. Benton one undivided fourth, of the

land and buildings belonging to the corporation. On the same day Seeley executed and delivered a deed in accordance with the vote, and on the same day Phelps and Benton mortgaged the property to Gaylord to secure their joint note to him for $20,000, being the price of his shares, and on December 12th, 1876, Phelps and Benton conveyed their equity of redemption in the premises to the Burton Brewing Company. Each deed was recorded upon the day of its date.

These negotiations, contracts, votes and deeds were parts of the plan to purchase Gaylord's shares and give him satisfactory security for payment therefor. The vote was passed and the several deeds were executed in the form in which they now appear because of the advice of counsel to the stockholders that in this mode the desired end could be legally accomplished; and the court finds that in the transaction and the negotiation and agreements leading to it "the said parties, Phelps, Benton and Gaylord, were neither of them actuated by any intent to defraud or deceive the creditors of the company, or by any fraudulent motive whatever, but they believed that what was done was lawfully done." Therefore fraud in fact is eliminated from the question before us.

Again, the transaction is to be viewed in the light of the financial condition of the company upon the day last named. Annexed to the finding is a copy of the inventory presented to the stockholders in January, 1876, in which its assets were valued at about $136,000 and its liabilities placed at at about $16,000, which last item was increased to about $21,000 on the day of the mortgage. It is true that there is also annexed an inventory, made in October, 1878, by appraisers under proceedings in insolvency, wherein the assets are valued at about $8,000 after the payment of the Gaylord mortgage. But we are not to assume that this last inventory in any degree impeaches the fairness and accuracy of the first. On February 4th, 1876, therefore, the assets of the company exceeded its liabilities by about $115,000. It is not then to be presumed that the creation of an additional obligation for $20,000 would result in insolvency, or would hinder or delay any creditor; and the finding in effect is that the

mortgage was neither made nor received with any reference to a state of insolvency present or future, or to the preference of the mortgagee over other creditors. Moreover Gaylord parted with shares representing one-fourth of the property of the corporation, thus giving valuable and full consideration for the security received. There is therefore no fraud in law in the transaction.

Again, if exercising their best judgment the stockholders came to the belief that the continued existence of the corporation and the preservation of its property could only be secured by the retirement on the part of Gaylord from managing any part of its business and from owning any of its shares, and that such result could best be effected by the mode adopted, the power thus to protect the corporate life is fairly within the law of its being, having in view its surplus of assets; and this whether the transaction assumed the form of placing corporate property in the hands of stockholders for the purpose of enabling them to accomplish the desired result, or the form of a purchase by the corporation of a sufficient number of its own shares to be held until a safe disposition thereof could be made.

The corporation having a surplus of assets to the amount of about $115,000, having power to pledge its property for the purpose, there being in the act no fraud in fact or law, no intended or resulting insolvency, no intended or resulting hindrance or delay to any creditor, no then existing creditor could have obtained a decree annulling the mortgage or postponing it to his own claim. Subsequent creditors could not have obtained such decree for the additional equitable reason that they had constructive notice of the pledge. Nor has the assignee as the representative of creditors greater rights or equities.

Again, Gaylord from the date of the mortgage ceased to have any connection with or any interest in the corporation, either as agent, director or stockholder. From that date he was a stranger to it and its proceedings. His security therefore is not to be destroyed or postponed by any subsequent

act of commission or omission on the part of continuing agents, directors or stockholders.

We advise that the petition be dismissed.

In this opinion the other judges concurred.