JAMES E. WOODBRIDGE *vs.* THE PRATT AND WHITNEY COMPANY.

First Judicial District, Hartford, May Term, 1897. ANDREWS, C. J., TORRANCE, FENN, BALDWIN AND HAMERSLEY, JS.

A concerted sale and transfer of their shares by all the stockholders of a business corporation to a syndicate, with a view to the continuance of the same business at the same place, under a new form of incorporation, followed by a transfer of its plant and property including all manufactured goods on hand, by the old company to the new one, is not a sale of such goods, within the meaning of a contract between the old company and one of its superintendents, under which he was entitled to a commission on the profits realized on all sales of manufactured goods.

A contractor with such a corporation, whose contract called for a renewal, or if a renewal were refused by it, then for a certain payment to him in lieu thereof, cannot claim that as such a transfer makes a renewal impossible, he is entitled to the sum stipulated in case of a refusal, when he, as a stockholder and director, has actively promoted the sale of shares and consequent transfer.

As the new company represented the purchasers of the shares in the old

company, the latter, after the reorganization (no complaint being made by the State), held its plant and property on an equitable trust for the former, subject only to the rights of creditors.

The contract called for a commission on profits from the sales of manufactured goods in each year, to be computed in view of certain annual charges for taxes, insurance, counsel fees, power, etc., which varied from year to year. The transfer of the property was made after two months of a certain year had elapsed. *Held* that the contractor was entitled to his commission on the sales for those months, but could not sue for them before the close of the year. Nevertheless, he having brought before that time an equitable action for an accounting, and then filed amendments after the year had elapsed, stating a case which would have supported his action, if brought at the time when the amendments were filed, and the trial court having thereupon ordered an accounting,—*held* that, though such order was erroneous because based on an action prematurely brought, still it ought not to be reversed, because it did substantial justice. The same facts, if pleaded in a supplemental complaint, would have been a proper foundation for the judgment, and such a merely formal slip in pleading was no sufficient ground of error.

An action at law can only be supported on the facts existing when it was first brought. Equitable proceedings rest upon different foundations, and in them the parties can always rely on new matter, if properly pleaded.

[Argued May 6th—decided June 15th, 1897.]

ACTION for breach of a special contract and, by way of equitable relief, for an accounting under the contract, brought to the Superior Court in Hartford County and tried to the court, *George W. Wheeler, J.;* facts found and judgment rendered for an accounting in part, and appeal by each party for alleged errors in the rulings of the court. *No error on either appeal.*

The finding showed the following state of facts: The defendant is a corporation chartered by this State, and until February 28th, 1893, was engaged in manufacturing at Hartford. Its business was conducted in several departments, one of which was known as the small tool department. On January 1st, 1889, it entered into a written contract with the plaintiff containing the following provisions: It was to maintain, develop and carry on for five years its small tool department, and the plaintiff was appointed the superintendent of this department, having the whole management thereof,

VOL. LXIX—20

subject only to the board of directors, for said term.   It was, during said term, to manufacture in, and deal in, through said department, goods similar to those that had been made by it under his superintendence, during a previous term, under a previous contract; and not otherwise to manufacture or deal in such goods; to keep an accurate account of all proper debits and credits to said department; and to give the plaintiff access to all its books and accounts.

Debits to said department were to be, for any year, only these: five per cent of the inventory price of all patents and plant used in it, on the inventory taken in January of that year; such proportion for that year of the taxes, insurance, counsel fees and expense of lawsuits, salaries of officers, incidental expenses of gas, interest on borrowed money, water, advertising, stationery, and postage, as the inventory price of the machines, shop tools, shop fixtures, patents, and goods manufactured, in whole or in part, in said department should bear to the inventory price in January of that year, of all the company's machines, shop tools, shop fixtures, patents, and goods manufactured, in whole or in part; fifty-five dollars per horse power for the amount of power and heat used in said department for that year; one per cent of the sales of goods manufactured in said department that year, for shipping and teaming, except when the boxing should be done in said department, in which case said percentage should be only one fifth of one per cent of the sales; the amount paid to agents, mechanics, and laborers for services rendered in or in behalf of said department for that year, and the amount paid in that year as royalty upon articles manufactured in said department; the cost of any and all materials used; also of any services not hereinbefore mentioned, regularly employed in manufacturing, displaying, selling, and delivering the goods manufactured in said department that year; and the cost of goods dealt in by said company through this department for that year.

All these debits were to be stated in itemized bills, and then presented to the plaintiff monthly for approval.   If he disapproved any bills or items, the board of directors might

nevertheless, by its approval before or during January in the following year, make them proper debits to the department, saving his right to resort to law to determine the difference between them.

The credits to said department for any year were to be the entire proceeds realized from sales for that year, of goods manufactured or dealt in by said company in or through said department.

The defendant was to pay the plaintiff each year during the term of this contract, except the last year thereof, an annual salary, to consist of $3,600, and a percentage of 10 per cent of the profits for that year ; and the same said last year, provided, as was intended, another contract should be made during said year substantially a renewal of the present one. If no such renewal contract were made, owing to the neglect or refusal of the defendant, the salary during said last year was to be $5,600, in addition to said 10 per cent of the profits of that year.    The plaintiff was to give his exclusive attention to the business during the term.

This contract was duly performed until February 28th, 1893, except that the plaintiff was paid no profits on sales made in January and February, 1893.

Early in 1890, the plaintiff and two others, all three being stockholders in the defendant, became dissatisfied with the management of the company, by the president and general superintendent, and tried to find parties who would buy out the other stockholders, and put the control of the business in the hands of a different president and superintendent. They resorted to one Reed, who had had some success as a promoter of corporate organizations, and at his request the directors, in March, 1892, voted to have an inventory and valuation made by experts of the assets and accounts of the company.   This was primarily intended to give Reed a basis to work on, in interesting capitalists, but the directors thought it would be worth its cost, even if Reed failed in his scheme of promotion.

In May, 1892, the experts reported, and Reed proposed that he should have an option from the owners of the major-

ity of the shares in the company, for 90 days, on certain terms. The directors were advised by counsel that this was the only practical mode of reorganization.   They approved the report of the experts, and gave it to Mr. Reed, and he obtained the options desired, expressed as follows:

### "*Shareholders' Option to George W. M. Reed.*

"Negotiations have been pending for some time for the purchase of the capital stock of The Pratt & Whitney Company, a corporation organized under Connecticut law by special charter, and whose capital stock is five hundred thousand dollars, divided into five thousand shares of one hundred dollars each.   The negotiation has been advanced by Mr. George W. M. Reed, who has solicited an option to buy the stock for the purpose of selling it to parties in England, who propose to form a new association as hereinafter set forth.   An inventory of the assets of The Pratt & Whitney Company and a statement of the profits of the business for a number of years have been made by experts named by said Reed. This inventory and statement have been by the company delivered to, Mr. Reed for his use in completing negotiations. The option desired by Mr. Reed is to buy all the shares of The Pratt & Whitney Company, so far as possible, upon the following terms: Each share to receive two hundred dollars in cash and two hundred dollars in securities of the new company to be formed by the purchasers, one third of said securities to be bonds secured by pledge of the assets of the new association to be formed, and including as part of said assets the capital stock of The Pratt & Whitney Company owned by said new association, or the property of The Pratt & Whitney Company, these bonds to bear interest at the rate of at least five per cent, per annum, one third to be cumulative preferred stock with preferred right to dividends at the rate of at least      per cent, per annum, and the remaining one third of said two hundred dollars to be payable in common shares of the capital stock of said new company to be formed.

" The new company is to be capitalized at $2,700,000, namely : $900,000 in bonds secured by first lien on the assets

of the company, $900,000 in the preferred shares, and $900,000 in common shares; and it is to be formed by Mr. Reed's English parties; but if necessary or convenient for purposes of holding land in this country, they may use a charter obtained for them from one of the United States.

"Now therefore, in view of the foregoing matters and things, we, the undersigned, being the largest shareholders of the capital stock of The Pratt & Whitney Company, and including all its directors, and owning more than a majority of said capital stock, in behalf of ourselves and of such other shareholders as we can affect by our influence, do hereby give to said Reed the option to buy all of our shares in said Pratt & Whitney Company upon the terms aforesaid.

" It is understood that the purchase shall include all the shares owned or controlled by the undersigned, and all the shares that any other stockholder is willing to sell upon the terms aforesaid, and it is hoped by both parties that the purchase will cover all the shares of the company.

" This option is to run for ninety days from the date of this memorandum of agreement, and no more. If, within said period of ninety days, Mr. Reed shall obtain a good and binding contract made to our reasonable satisfaction by parties of reliable character and pecuniary responsibility for the purchase from him of all the shares of the stock of The Pratt & Whitney Company owned by the undersigned, and all the shares of all and several the shareholders of said company who are willing to sell upon the terms aforesaid, such purchase to be completed within the term of six months from the date of this memorandum, or if said Reed shall, within said period of ninety days, obtain a good and binding contract made to our reasonable satisfaction by parties of reliable character and pecuniary responsibility, agreeing to purchase directly from the undersigned and all and several, the shareholders of said company, all their shares on the terms aforesaid, such purchase to be completed within the period of six (6) months from the date of this agreement, sale and delivery to be made at the company's office in said Hartford, or at the office of a trust company satisfactory to all parties, and, if

said Reed shall within said period of ninety days produce such contract and offer the same to the directors of said Pratt & Whitney Company, then we agree to join in a contract with said Reed or with his assigns as co-contractors in our behalf, and in behalf of all such other shareholders as we can affect by our influence for the sale and transfer of all the shares owned or controlled by us upon the terms hereinbefore set forth.

" Unless said Reed shall produce such contract in writing within said period of ninety days (and time is an essential element of this memorandum of contract), then all claims upon us or The Pratt & Whitney Company on account of this option and of our antecedent negotiations shall cease and determine without any further action or notice on our part or on the part of said Pratt & Whitney Company.

" Until the shares are in fact purchased and paid for, it is understood that the affairs of the company shall go forward in any and all respects as if no trade was in view, and the usual dividend not to exceed five dollars a share may be made on September 1st, 1892.

" Dated at Hartford this        day of        1892."

.   The option having been extended, the scheme was finally guaranteed by underwriters, A. M. Kidder & Co. agreeing to advance the necessary funds ; and on November 9th, 1892, the following agreement was made and countersigned :—

" Agreement of Geo. W. M. Reed with the shareholders and the American National Bank.

" The principal holders of The Pratt & Whitney Company stock having given Mr. G. W. M. Reed an option to purchase their shares of said stock, and the shares of such other stockholders as may choose to join with them in said sale upon terms hereinafter set forth, and Mr. Reed having decided to use said option and to buy the said shares : It is hereby agreed between the said Reed, party of the first part, and Messrs. Francis A. Pratt and Amos Whitney, the said Pratt and Whitney acting for themselves and all and several of the

other stockholders who will sell their stock to Mr. Reed on these terms, party of the second part, and the American National Bank of Hartford, party of the third part, as follows :—

"Mr. Reed agrees to buy all and several of the said shares of The Pratt & Whitney Company's capital stock, at the price for each share of said stock, of two hundred dollars in cash, and one hundred dollars in preferred stock, and one hundred dollars in common stock of a new corporation to be lawfully formed, and to bear the name of Pratt and Whitney, and to succeed to the business and good will of The Pratt & Whitney Company.

"Payments to be made as follows: one hundred dollars within a reasonable time after deposit, in the time hereinafter specified, of any of said shares with the American National Bank, for the purposes hereinafter set forth; one hundred dollars, and the said two hundred dollars in stock, one half preferred, and one half in common, of the said new company, on or before the 5th day of January, A. D. 1893.

"Any and all of the shareholders of The Pratt & Whitney Company may deposit their shares with the American National Bank, at any time after the 5th day of December, A. D. 1892, and before the 5th day of January, A. D. 1893, with an assignment and power of attorney to transfer the same to the nominee of Mr. Reed, which stock shall be and remain the property of the stockholders depositing it until full and final payment of the purchase price as aforesaid, according to its amount and time of payment, and if the full amount of said payments is not made as aforesaid, any and all partial payments upon the same shall be forfeited to the said several shareholders, without any right or claim to the same by the said Reed. The said bank is to hold the said shares for the said stockholders and for the conditional purchaser until said payment is fully made according to its terms of amount and time, and then the said bank is to complete the transfer of said shares to the nominee of the purchaser, and on failure of Mr. Reed to complete this purchase in manner and form as aforesaid and within the time aforesaid, then the bank

312 JUNE, 1897.

Woodbridge *v.* Pratt and Whitney Company. Vol. 69

is to return said certificates to the several stockholders who deposited them.

" Messrs. Pratt and Whitney for themselves, and for such other shareholders as elect to join with them in the sale, and for such shareholders as they can influence, agree to sell all their Pratt & Whitney stock to Mr. Reed upon the foregoing terms, and it is further agreed that any and all stockholders in the Pratt & Whitney Company may sign this instrument, and be included for all purposes in its party of the second part, as they are now intended to be so included beneficially by the signatures of said Pratt and Whitney. And. the American National Bank agrees to fulfill all its agencies and attorneyships raised by the terms of this agreement.

" This agreement is made in consideration of the stipulation with each party by the other, and is executed in triplicate at Hartford, this 9th day of November, A. D. 1892."

Among the signers was the plaintiff.

This contract was sent to the stockholders, with the following circular : —

" Private office of The Pratt & Whitney Company.

" To the stockholders of The Pratt & Whitney Company : Doubtless you are all aware that negotiations in your interest have been pending for some months, looking to a sale of our stock at a price largely above the value put upon it by the market. The negotiations have been completed, and the enclosed is a copy of a contract made in behalf of all stockholders who wish to avail themselves of the privilege of selling their stock for the price of four hundred per centum of its face value—$200 in cash and $200 in new Pratt & Whitney stock for each share. One half of the new stock is to be preferred stock, entitled to 8 per cent. cumulative dividends, if they are earned. The new company's capital is to be $3,000,000, $250,000 of which is to be added to the plant.

" We believe it is for the interest of every shareholder to sell his stock upon the terms indicated.

" Stockholders will observe that it is necessary to act im-

mediately in order to participate in the sale.  Certificates should be promptly surrendered.

"The directors will be glad to assist any of the stockholders in the transaction, and to furnish any further information in their power.

"Of course this is a private transaction, and this circular and the contract are for the information and use of shareholders of The Pratt & Whitney Company only.

"FRANCIS A. PRATT,
"AMOS WHITNEY,
"ROSWELL F. BLODGETT,
"MILES W. GRAVES,
"HENRY C. ROBINSON,        "Directors Pratt &
"ROWLAND J. SWIFT,         Whitney Company."
"S. W. BISHOP,
"A. S. COOK,
"J. E. WOODBRIDGE,

A. M. Kidder & Company were to organize the company capitalized at $3,000,000, to issue 17,500 shares of preferred stock and 10,000 shares of common stock, par value $100 each, to subscribe for 10,000 shares of the preferred stock which they proposed selling to the public, and advance $1,000,000 to the shareholders of the Hartford company ; to give the shareholders of said company 5,000 shares of preferred and 5,000 shares of common stock; to leave 2,500 shares of preferred stock as treasury stock in the treasury of the new company, and to take 2,500 shares of the preferred and 5,000 shares of the common stock, $750,000 par value, in all, wherewith to pay the expenses of the transaction, the commissions to the underwriters and the profits to them and to Reed.

Pursuant to this agreement, A. M. Kidder & Company issued a prospectus on November 21st, 1892, to the public, offering 12,500 shares of the preferred stock for sale and inviting the public to take this stock, which they did in large amounts.

Pursuant to the agreement with Reed and in accordance

with the understanding of the directors and principal share-
holders of the Hartford company, A. M. Kidder & Company
on December 1st, 1892, caused to be duly and legally organ-
ized the "Pratt & Whitney Company" of New Jersey, with
a capital of $2,000 paid in and a total authorized capital of
$3,000,000, to be divided into 20,000 shares of preferred and
10,000 shares of common stock.   On the same day the stock-
holders voted to increase the capital to $3,000,000.

On December 28th, 1892, the directors voted to levy an
assessment of $100 a share.

Mr. Reed then appeared before the board and submitted
the following proposition :—

"To Pratt & Whitney Co.,

"Gentlemen :—I hereby offer to sell to your company all
the capital stock of the Pratt & Whitney Company of Hart-
ford, Conn., together with contracts of Francis A. Pratt and
Amos Whitney, executive heads of the Hartford Pratt &
Whitney Company, for their continuance for not less than
five years in the management of the business.   The owner-
ship of this stock will enable your company to acquire all
the property, plant, and good will of the Hartford company.
I confidently expect to be able to deliver to you at once all
the shares of the Hartford company.   There may be, how-
ever, some delay in delivering a very trifling amount, not to
exceed in any case 25 shares.   I offer to sell and deliver the
above to you in consideration of the payment to me by your
company of $2,748,000, payable as follows : $1,750,000 in full
paid and non-assessable preferred stock amounting to 17,500
shares, and $998,000 thereof in full paid and non-assessable
common stock of your company, amounting to 9,980 shares."

The board then passed the following resolutions :—" Re-
solved, That the proposition of Mr. Reed be and the same
hereby is accepted, and that the president and treasurer be
and they hereby are authorized to issue to Mr. Reed 17,500
shares of the preferred stock of this company and 9,980 shares
of the common stock of this company, in payment for the
property mentioned in said proposition, such issue to be made

upon the delivery of such assignments, transfers, and other instruments as shall be satisfactory to the president, provided, however, that no issue of said stock shall be made until after the filing of the certificate provided for in the previous resolution of the board.

"*Resolved further*, That all shares of stock mentioned in this resolution shall, when issued in accordance therewith, be deemed and taken to be and the same hereby are declared full paid and non-assessable stock, and not liable to any further call."

At a meeting of the board held on January 3d, 1893, the president reported that he had arranged with Mr. Reed for the issue of the stock authorized at the last meeting to be issued to him in payment for the property mentioned in his proposition. The board then adjourned to meet at the office of the American National Bank at Hartford, Conn., on January 4th, 1893.

The certificates of stock of the Hartford company of all the shareholders therein were surrendered to the American National Bank as trustee after the agreement of November 9th, 1892, and assigned in blank. The shareholders gave Mr. J. R. Redfield a power of attorney to transfer these, and upon his nomination the bank delivered all of these certificates either to Reed or Redfield on January 4th, 1893. Before this delivery the bank had received from A. M. Kidder & Company, through the Fourth National Bank of New York, the million dollars for the said shareholders in accordance with the contract with Reed. Mr. Reed or Mr. Redfield, his nominee, took these certificates to the secretary of the Hartford company, and he made out a certificate for 4,991 shares in the name of the New Jersey company, and thereafter on January 4th, 1893, Reed delivered this certificate to the New Jersey company and the company delivered to Reed 17,500 shares of its preferred stock and 9,980 shares of its common stock. Thereupon 5,000 of these preferred and 5,000 of these common shares were delivered to the old stockholders of the Hartford company, one share of each for one share of the old stock. Ten thousand of these preferred

shares were taken by A. M. Kidder & Company for them-
selves and the underwriters to pay for the advance of the
million dollars.  Two thousand five hundred of the preferred
and 5,000 of the common shares were taken to pay the
expenses, the commissions, and the profits of negotiating and
carrying out this scheme by A. M. Kidder & Company and
Reed.

On February 21st, 1893, nine shares of the Hartford com-
pany were assigned to Pratt & Whitney Company of New
Jersey, by Jane E. Case, by J. R. Redfield, Attorney, and on
the same day one of these shares was transferred by Pratt &
Whitney Company of New Jersey by J. R. Redfield, Attor-
ney, to each of the following persons : Francis A. Pratt, Amos
Whitney, R. F. Blodgett, H. C. Robinson, Rowland Swift,
J. E. Woodbridge, W. W. Hyde, J. R. Redfield, and G. W. M.
Reed, making nine in all, and being said above nine shares,
and making with said certificate of 4,991 shares, all the shares
of the capital stock of the Hartford company.  The action of
J. R. Redfield above was duly approved by the New Jersey
company.  The above named persons were the directors of
the Hartford company, and the said transfers to them were
made in order to qualify them to act as directors of said com-
pany, and they were the directors of said company on Feb-
ruary 28th, 1893, and until the next annual meeting.  The
said G. W. M. Reed was elected treasurer of the Hartford
company March 25th, 1892, and continued as such to about
May 1st, 1896.

The original directors of the New Jersey company, as well
as the original stockholders, had been mere figureheads for
organization purposes.  The directors subsequently resigned,
and on February 28th, 1893, and until the next annual meet-
ing, the following named persons were the directors of the
New Jersey company : Francis A. Pratt, Amos Whitney,
Henry C. Robinson, Rowland Swift, G. W. M. Reed, Cor-
nelius C. Cuyler, Roswell F. Blodgett, W. W. Hyde, J. R.
Redfield, A. M. Kidder, S. E. Elmore.  During said period,
the following named persons were the officers of the com-
pany : F. A. Pratt, president; A. Whitney, vice-president;

R. F. Blodgett, secretary; and G. W. M. Reed, treasurer. Between December 28th, 1892, and February 28th, 1893, J. R. Redfield was the treasurer of the company, but had little to do.

The meeting of the directors of the New Jersey company of January 3d, adjourned to January 4th, to meet at the American National Bank at Hartford, was adjourned to February 22d, and then to February 28th, 1893. All of the directors were present. The following vote was unanimiously passed: " Voted, to request the old The Pratt & Whitney Company to deliver possession of all its real estate to this company for its use, and without rent, and to vest in and deliver to this company all its personal estate, save and excepting such items as may be deemed best by this company to remain in the name of the old company, and all its contracts and its good will, this company to provide from said personal estate for the payment of all outstanding debts, obligations, and liabilities of the old company, and to undertake all the items of its business of every name and nature, saving that the fee of its real estate is to remain with it for the present, and also the title to such items of the personal estate, especially patents, as the new company may think best."

On February 28th, 1893, the stockholders of the Hartford company duly met in the American National Bank, and adjourned an hour while the said meeting of the directors of the New Jersey company was held. The stockholders present were the same persons as the directors of the New Jersey company, except S. E. Elmore. After the interval of about an hour, the meeting of stockholders was resumed, and a vote was passed to transfer the property from the Pratt & Whitney Company, of Connecticut to Pratt & Whitney Company of New Jersey, in accordance with the following vote, which was received from the board of directors of the latter company, viz: " the vote above set forth of the directors of the New Jersey company.

On March 25th, 1893, the directors of the Hartford Company voted " to accept and confirm the transfer of property from the old to the new company, in accordance with the

vote to that effect passed by the new company at the meeting of its directors held on February 28th, 1893, and by the stockholders of the old company at the annual meeting held on February 28th, 1893."

The purpose and intent of these votes was to transfer to the New Jersey company all the property and business of the Hartford company except the real estate and the patents; the transfer of which was for the present postponed for the reasons hereinafter stated. The intention of all concerned from the beginning was to get the entire property and plant in the hands of the new company, and everything done was to this end, and all was done deemed necessary to accomplish this end.

No money was in fact ever paid into the New Jersey company except for the original $2,000 of stock. Mr. Reed never paid anything to the New Jersey company for said shares transferred to him except by the transfer of the stock of the Hartford Company, and he never himself paid a dollar to the shareholders of the Hartford company, or to the Hartford company; the only money paid was by A. M. Kidder & Company, as described above.

The Hartford company stock at the date of the contract was worth between $200 and $225 per share, and the price paid was largely in excess of its value, and so regarded by the said directors and principal shareholders of the Hartford company.

Pursuant to these votes, and to carry out their purpose, the New Jersey company had delivered to it and went into possession of the entire plant and property of the Hartford company on and after February 28th, 1893, and carried on and conducted the business formerly conducted by the Hartford company, at the same place and substantially in the same manner that it had been before conducted, without any break in said business, buying goods and selling goods on hand as usual. The executive officers, excepting the treasurer, remained the same. Contracts relating to the business were made and entered into by the New Jersey company relating to the conduct of this business. Buildings enlarging

the facilities of the New Jersey company were erected after May, 1893, and became a part of this plant, and were paid for out of the funds of the New Jersey company.

The liabilities of the Hartford company, which the New Jersey company assumed, were upwards of $200,000, and as these became due the New Jersey company either paid or arranged for them. The New Jersey company used the same books as the Hartford company, including the bank book. Checks were signed by the same name, omitting the " The." The omission of this word constituted the difference in name between these two companies.

On March 25th, 1893, the directors of the New Jersey company declared a dividend on the preferred stock of 2 per cent, payable on and after April 1st, 1893. The large majority of stock of the new company was held by persons not stockholders in the Hartford company.

Mr. Reed was elected treasurer of the New Jersey company February 28th, 1893, and continued as such until its dissolution. He collected the bills and accounts, and put them to the credit of the New Jersey company. He paid all the bills, including pay-rolls, salaries, and material accounts. These bills and accounts included all of those existing February 28th, 1893, of the Hartford company, and all those thereafter of the New Jersey company, as long as the company continued. The first bills paid by the New Jersey company were paid by Reed. Under express authority of the directors he negotiated loans amounting to $150,000 during the first six months of the business of the company; all the loans, in fact, used in this business, including renewals of bills payable of the Hartford company, contracted before February 28th, 1893, he had made. He made report of the condition of the New Jersey company to its directors from the books of the company, and included in it a report of the entire business of the concern on March 25th, 1893. All of these acts were done by Reed by virtue of the said votes of February 28th, 1893.

After February 28th, 1893, and down to the dissolution of the New Jersey company, the Hartford company transacted

none of the business it formerly did, and in fact, did no business; and after said date, from the facts herein stated, the court found that said contract with Woodbridge was terminated.

The votes above mentioned were passed to carry out the entire arrangement made with Reed, as outlined in his said proposition to the New Jersey company. Their purpose was to make a complete transfer of the property, plant and good will of the Hartford company to the New Jersey company. The form of transfer was agreed upon by counsel for the New Jersey company and Hartford company, who were fully authorized, and the votes were passed in pursuance of a previous arrangement fully understood and agreed upon by the directors of each company, and by all of the stockholders of the Hartford company, and the majority of stockholders of the New Jersey company. The real estate and patents were not transferred because of the expense and complications attendant thereupon. It was proposed by all of the parties in interest that an attempt should be made to secure an amendment to the Connecticut charter of The Pratt & Whitney Company, permitting an increase of stock to $3,000,000 and the issue of preferred and common shares to correspond with those of the New Jersey company, so that the New Jersey company might be then merged in the Connecticut company. It was believed that this name, The Pratt & Whitney Company of Connecticut, was much more valuable to do business with than the New Jersey company name. In furtherance of this intent, on March 3d, 1893, an amendment to the charter was introduced in the General Assembly, and on April 19th it was duly passed and approved. It provided for an exchange of shares of the New Jersey company for corresponding shares of the Hartford company, and for the merger of the existing shares of stock of the New Jersey company in said new shares. The amendment was accepted by the Hartford company September 26th, 1893. This exchange and merger was in fact made on November 22d, 1895. The New Jersey company was dissolved December 30th, 1895. After November 22d, 1895, the Hartford company conducted

the business of the New Jersey company. The Hartford company did, so far as it could, transfer its title to and possession of all its plant, property, and good will to the New Jersey company in consideration of the assumption by it of its debts, contracts, and obligations, and of its entire ownership of its stock, and, in order to carry out the said arrangements heretofore described, the payment of the million dollars in cash and the one million dollars in stock to the stockholders of the Hartford company was, in fact, a part of the consideration of the transfer, and these payments were, in fact, made for the New Jersey company.

There was included in said transfer the small tool department and goods therein, manufactured by said Woodbridge in accordance with his said contract, of very large amount. Nearly all the items of debit referred to in said contract had already been paid for by said department, and the proceeds of these goods, when sold, would have represented in large part profits as defined in said contract.

What exactly appeared upon the books of the Hartford company was, by stipulation of counsel, not gone into upon this hearing, and no evidence was offered from which under the contract any profits could be determined.

Woodbridge knew all about and took part in the negotiations with Reed leading to the contract of November 9th, 1892. He himself was a large stockholder in the defendant and signed the contract of November 9th, 1892, and surrendered his stock upon the terms therein stated. He advised and urged others to sell their stock upon these terms, and signed with the other directors the circular letter. He expected that the new company was to assume the debts of the old company and to take possession of the plant and continue the business under a different management, and to assume his contract and all the other outstanding contracts of the old company. He expected to be a director in the New Jersey company, until sometime shortly before February 28th, 1893. He at no time ever communicated anything regarding his contract, or a claim for commission under it, to any director or officer of the defendant, or of the New Jersey

company, except as hereinafter stated. He continued to carry on the small tool department after February 28th, 1893, and down to July 31st, 1893, in substantially the same manner he had been doing before February 28th, 1893, and received from the New Jersey company for services at the same rate he had before received from the Hartford company for salary under his contract. The payments were made by checks, which stated they were for the salary account. He continued as a director of the Hartford company up to February 28th, 1893, and was on that day re-elected a director of the Hartford company. He was not present when the said stockholders' vote of February 28th, 1893, was considered or passed. He underwrote $10,000 of the stock of the New Jersey company, and received therefor, many months. after, $500 in preferred and $2,000 in common stock of the New Jersey company as commission.

He had been advised by his counsel in January, 1893, that, in case the transfer to the New Jersey company was effected, he would have a claim for 10 per cent of the profits on the goods in the small tool department. He learned of the votes of February 28th shortly thereafter, and on March 3d notified Mr. Reed he would not continue with the new company. Reed sent him to J. R. Redfield, and shortly after this, and before March 27th, 1893, he notified Mr. J. R. Redfield, through his attorney, that he should not continue his contract with the New Jersey company. Redfield was perhaps the most active among the directors of each company. At the request of Redfield made to Woodbridge's attorney, he agreed to continue with the New Jersey company temporarily, and did so continue.

On March 27th, 1893, he caused to be served upon the New Jersey company this notice :—

" To the directors of Pratt & Whitney Company, organized and doing business under the laws of New Jersey :—

" Dear Sirs,—I hereby give the above-named company notice that I do not desire the fact that I have been in its employ since its organization until now, or the fact that I

may continue in its employ upon indefinite terms, until a contract may be made by and between said company and myself, or until it is decided that a contract shall not be made by and between said company and myself for my services, to be understood in any manner as indicating or admitting that I am willing to accept, or that I do accept said company in any manner to be substituted to the place of, or to perform any of the duties imposed upon The Pratt & Whitney Company of Hartford, Connecticut, by a contract made by and between The Pratt & Whitney Company of said Hartford and myself for the term of five years from the first day of January, 1889.

" JAMES E. WOODBRIDGE."

After March 27th, 1893, Woodbridge continued in the employ of the New Jersey company at the request of said Redfield and Mr. C. C. Cuyler, the largest underwriter and one of the directors of the new company, made to him after February 28th, 1893, and before March 27th, 1893, to continue temporarily with the company. Woodbridge never served notice upon the Hartford company of his termination of his contract with it. He regarded the contract as terminated by the transfer of February 28th, 1893. The Hartford company and no one representing it ever said anything to him before or after February 28th, 1893, except as stated, regarding his contract or his continuance under the contract. He never communicated with the New Jersey company or any of its directors or officers regarding the continuance of his contract, except with Cuyler and Redfield. He was never formally hired or employed by or had any contract with the New Jersey company, but continued on with them as herein stated. He had intended to continue on with his contract with the New Jersey company, provided the management of the New Jersey company had not been the same as the Hartford company, but after learning of this before February 28th, 1893, he at once determined not to continue his contract with the New Jersey company, and at no time and with no persons ever agreed to continue under said contract, and no one

ever spoke to him about it or requested him to continue, except as herein stated.

After it had been determined that there was to be no change in the management of the business, Woodbridge for a while expected to be a director of the New Jersey company and intended to continue his contract with the New Jersey company, but after February 28th, 1893, he never intended to continue and never did continue his said contract with the New Jersey company, nor assent to its assumption of his contract. The New Jersey company never arranged with him to continue his contract or said anything to him about continuing his contract, nor he to them.

After February 28th, 1893, the Hartford company ceased to manage the business formerly conducted by it, and had in fact no business to conduct and no plant to operate a business with, and no means of carrying out its contract with Woodbridge, and the contract with Woodbridge was in fact terminated by said transfer.

On June 20th, 1893, he wrote to the Hartford company asking them to state to him " the sum for which the manufactured goods, made or dealt in by the small tool department of your company, were sold by your company to Pratt & Whitney Company of New Jersey on or about February 28th, 1893." The company replied that " there has been no sale of manufactured goods or of any of the property or assets of the old Pratt & Whitney Company to the New Pratt & Whitney Company (of New Jersey). Whatever property was vested in the new company, the owners of all the stock, was so vested upon no other consideration than the fact of entire ownership and of the new company's assuming the obligations of the old company."

On July 20th, 1893, this suit was brought. On July 26th, 1893, the plaintiff wrote to the New Jersey company as follows: " I hereby give you notice that I shall terminate my connection with the above named company on the 31st day of July, 1893, or sooner if it is your pleasure," and on July 31st, he terminated all connection with said company and ceased his management of the said small tool department.

Woodbridge's commissions as profits under the contract had always, before said February 28th, 1893, been figured up and paid at the end of each year for the year past. He has never been paid by the defendant or anyone else for any profits upon the goods which were sold in January and February, 1893, in the usual course of business of the Hartford company, nor for any profits upon the goods in the small tool department transferred to the New Jersey company on and after February 28th, 1893, nor for the $2,000 increased salary referred to.

Upon the trial the plaintiff requested the court to decide as follows:—

*First.* That upon the facts the transaction by which all the property of the Hartford company, including the small tool department, was transferred by the Hartford company to the New Jersey company was a sale of such property; that thereby the Hartford company had sold to the New Jersey company a large quantity of goods which had been manufactured by the plaintiff in the small tool department under the contract; that under said contract the plaintiff was entitled to recover from the Hartford company ten per cent upon the amount of profits which the Hartford company received upon said sale of such goods, and that the defendant company should be obliged to account for such profits.

*Second.* That upon the facts the plaintiff was entitled to recover from the defendant the sum of $2,000 additional salary provided for in said contract, as it was in consequence of the acts of the defendant that it became impossible for any additional contract to be made between the plaintiff and defendant; but the court refused so to hold and decide.

The defendant upon the hearing claimed as matter of law: (1) that no sale of the goods in the small tool department under the contract between Woodbridge and the defendant had been shown; (2) that no sale had been made by the defendant to the New Jersey company; (3) that there was no transfer of the property of the defendant to the New Jersey company which operated to terminate the contract between the defendant and Woodbridge; (4) that the contract was,

in fact, terminated by Woodbridge himself, and, therefore, Woodbridge had no claim against the defendant; (5) that Woodbridge by his conduct, both acts and omissions, both before and after February 28th, 1893, had waived any claim against the defendant on account of the claimed sale by the defendant to the New Jersey company, and was estopped from making the claims set up in this action ; (6) that Woodbridge's conduct, both acts and omissions, constituted an election to continue with the reorganized company under his contract; (7) that Woodbridge's conduct, both acts and omissions, was legally inconsistent with his present claims that the reorganization constituted a sale by the defendant and was a breach of his contract; (8) that under the contract between Woodbridge and the defendant the commissions were to be fixed at the end of the year, and that he had no claim on which this action could be based at the time of the commencement of his action ; and (9) that as to the claim for $2,000 additional salary set up in the 6th count, no such neglect or refusal on the part of the defendant to make a new contract as the contract provided, had been shown, and that he was not entitled, therefore, to the penalty claimed.

The court sustained the first claim of the plaintiff, overruled the defendant's claims 1 to 7 inclusive, and sustained the conclusion set forth in claim 9. As to claim 8, it held that the plaintiff could not recover the entire damages resulting from a breach of the contract; but ordered an accounting for the profits realized by the defendant from the sales made from the small tool department during the months of January and February, 1893, and judgment for ten per cent of the amount of said profits with interest thereon from March 15th, 1893; with directions not to consider in computing said profits the transfer by the defendant of the entire small tool department to the Pratt & Whitney Company of New Jersey, but only such sales as were made in the ordinary course of business by the defendant during said two months.

From this interlocutory judgment each party appealed, under the provisions of Chap. IV of the Public Acts of 1895, p. 446.

*William Waldo Hyde* and *Lucius F. Robinson*, for the defendant.

The plaintiff is not entitled to any accounting under his contract with the defendant, for profits from sales made in January and February, 1893. The plaintiff's right under the contract for an accounting did not accrue, nor was such accounting possible until December 31st, 1893—many months after this action was instituted. The contract as to commissions was an entire contract for each year. 2 Par. on Cont. 519; *Davis* v. *Maxwell*, 12 Met. 286; 3 Amer. & Eng. Ency. of Law, 916. The record shows that Woodbridge himself terminated the contract. Under these circumstances it is clear that he cannot claim any commissions at the date of this suit. *Ryan* v. *Dayton*, 25 Conn. 188; *Clark* v. *Terry*, ibid. 395. The New Jersey company, as the owner of all the stock of the Hartford company, although having no legal title, had such an interest in the assets that it had a right to take them into its possession and treat them just as it did in this case. *Millsap* v. *Merchants' & P. Bank*, 71 Miss. 361. The acts done were in no sense the acts of a purchaser of the goods. There was no sale of the defendant's property. The essential elements of a sale were lacking. No pecuniary or other consideration passed from the New Jersey company to the Hartford company, unless the assumption by the New Jersey company of the obligations of the Hartford company constituted such consideration. It is essential to every sale that some pecuniary consideration shall pass. 21 Amer. & Eng. Ency. of Law, 446–7, and notes; *Speigel* v. *Meredith*, 4 Biss. 123; *Vail* v. *Strong*, 10 Vt. 465. The only sale claimed or shown in this case, was a sale by the shareholders of their respective holdings. This was not a sale by the defendant corporation, as a corporation, of its property. The sale of shares conveys no legal title to the assets of the corporation. Shareholders have no vested interest in the property of a corporation which they can convey. 1 Moraw. on Priv. Corp. § 233; 23 Amer. & Eng. Ency. of Law, 851 and cases cited; *Smith* v. *Hurd*, 12 Metc. 371, 385; *Humphreys* v. *McKissock*, 140 U. S. 304, 312; *Durant* v. *Kenneth*, L. R. 5 C. P. 262;

*Parker* v. *Bethel Hotel Co.*, 31 L. R. A. 706; *Tenn. Syndicate Insurance Co.* v. *Bohn*, 65 Fed. Rep. 165, 169; *Einstein* v. *Rochester Gas & Elec. Co.*, 146 N. Y. 46. Even if there were a technical sale of the property of the defendant to the New Jersey company, the plaintiff cannot recover unless he can show that there were profits received by the defendant, upon which he was entitled to a commission. But the defendant corporation never received a cent from anybody on account of the alleged sale. A contractor cannot from mere caprice or personal spite refuse to fulfill his contract duties under a reorganization, which involved no change in those duties and no change in his superior officers, especially where his contract gives him so much independence as the one before the court. But if the plaintiff could have treated the reorganization as a breach of his contract, he waived his right to claim and is now estopped from claiming the same. Bigelow on Estoppel, 369; *Hawley* v. *Middlebrook*, 28 Conn. 527; Clark on Contracts, 676; *Hennessy* v. *Bacon*, 137 U. S. 78, 84; *Gingrass* v. *Iron Cliffs Co.*, 48 Mich. 413; *Rau* v. *Little Rock*, 34 Ark. 303; 2 Pomeroy's Eq. Jur., § 819; *Kent* v. *Quicksilver Mining Co.*, 78 N. Y. 159, 184; *Carr* v. *London & N. W. R. R. Co.*, L. R. 10 C. P. 307, 317. The plaintiff is not entitled to any additional salary. Nothing in the finding discloses any such refusal or neglect on the part of the defendant to renew the contract. It appears that the plaintiff, by his own act, terminated his contract connection with the defendant in July, 1893. At that time it was not the duty nor within the power of the defendant, to make a new contract with the plaintiff.

*Charles E. Perkins* and *Daniel A. Markham*, for the plaintiff.

The transaction disclosed by the record was a "sale" within the meaning of the plaintiff's contract, so far as the goods in the small tool department were concerned. *Ins. Co.* v. *Boon*, 95 U. S. 128; *Ins. Co.* v. *Gridley*, 100 id. 615; *Lines* v. *Flagg*, 4 Conn. 590; *Bulkley* v. *Chapman*, 9 id. 8; *Meech* v. *Ensign*, 49 id. 203. The Hartford company parted

with all its interest in these goods to the New Jersey company, at a valuation. In payment therefor, and for the other property, the New Jersey company paid one million dollars in cash, and one million in stock of the new company; it received the goods as its own, and has ever since treated them as its own. The Hartford company practically ceased to exist, and incapacitated itself from ever carrying out its contract. It makes no difference that the money and stock was delivered to the stockholders, instead of to the officers of the company. The result is exactly the same as if it had been given to the corporation, and it had distributed it among its stockholders. That such a proceeding is valid, when all the stockholders agree to it, is settled in *Byrne* v. *Schuyler Co.*, 65 Conn. 336, and the cases there referred to. Nor can it affect this question that no bill of sale or other instrument of conveyance of these goods was executed. A sale of personal property needs no written instrument. We submit that there was here a sale within the fair meaning of the contract and understanding of the parties, as much so as if the Hartford company had sold out to the New Jersey company all of the goods in this department which it had on hand, and that it is now bound to account, and allow Mr. Woodbridge to show what profit it realized on the transaction. The defendant sets up a claim of estoppel, but there is nothing on which to found it. *Chase's Appeal*, 57 Conn. 264. There is nothing in the facts found to show that the defendant changed or altered its position in consequence of any acts or conduct of the plaintiff. There is no pretense that this arrangement being carried out was dependent in any way on the existence of this claim of the plaintiff. By the provisions of the contract the plaintiff was to receive $2,000 addition to his salary during the "last year," provided a new contract was not made, through the "neglect or refusal" of the defendant. It is agreed that no new contract was made. What was the reason? The defendant was utterly incapacitated from making any contract by its own act of selling out bodily its whole plant and business. It not only did not attempt to, but could not if it had, make any new contract.

BALDWIN, J.   The contract between the parties of January 1st, 1889, made the compensation for the plaintiff's services, outside of his stated salary, dependent on the profits annually realized upon the sales for the year of goods manufactured or dealt in under his superintendence, and in his particular department of the business.   He contends that the transfer of the main assets of the company, in 1893, to the New Jersey corporation, which had been organized to succeed to its business, in which transfer all the goods then in the small tool department were included, was in substance a sale of those goods, for a price which can readily be computed by the aid of the inventory and the defendant's books, out of the profits from which he is entitled by the contract to receive ten per cent.

The Connecticut company sold nothing to the New Jersey company.   Its stockholders sold their shares to certain individuals who caused them to be transferred to the New Jersey company.   Thereupon (subject only to any rights of creditors) the property of the defendant, which had been held by it for the benefit of its previous shareholders in certain proportions, remained in its keeping for the benefit of its new shareholders, that is, in effect, of the shareholders in the New Jersey company.

The latter had been organized by concert between its shareholders and those of the defendant, in order to succeed to the defendant's plant and property, and to carry on its business without any break or interruption.   Where all the stockholders in a corporation act together in its behalf, though there may be no regular meeting or formal vote, their action is substantially corporate action.   *Wood* v. *Wiley Construction Co.*, 56 Conn. 87, 96.   So where the directors of a corporation, by the desire of all the shareholders, take corporate action which has no other end than to protect or promote the shareholding interest, the form of the transaction (if no rights of creditors are involved) is of little importance in determining its validity.   *Smith* v. *Gaylord*, 47 Conn. 380, 383.   The Hartford company, being in possession of property under a legal title, for the use of those holding the beneficial title (namely

the New Jersey company, in its own right and as representing the nine individuals in each of whom had been vested, at its instance, one share in the Hartford company), transferred both its possession and its title to the real owner. No objection was interposed by any party in interest or by the State. The transfer, therefore, must be treated as effectual for the purpose for which it was planned and executed. This was the continuance of the business of the Hartford company upon a different basis of capitalization and for the benefit of a new set of stockholders. That business was to make and sell certain goods. The goods which were on hand, unsold, on February 21st, 1893, when the last share outstanding of the Hartford company was assigned to the New Jersey company, thereupon became in equity the property of the latter, and if thereafter sold, would be sold for its benefit. Their delivery to it, a week later, simply changed the hand by which any such sales would be made. It did not affect the equitable title to the proceeds, or to the goods themselves. It simply clothed the equitable owner with the legal title and the possession which was its proper incident.

The plaintiff's claim to an accounting of the profits derived from an alleged sale of these goods was therefore properly disallowed.

Nor was he entitled under his contract to an additional salary of $2,000, for the last year of the term. Aside from any other considerations, such addition was only to become due, if the contract were not renewed by reason of the negligence or refusal of the company. He contends that the transfer of February 28th, 1893, made any such renewal impossible. But if this be so, the transfer was the natural consequence of a reorganization actively promoted by the plaintiff, and under which he had originally intended to consent to a novation of his contract by its continuance under the New Jersey company. He cannot found a claim against the defendant, for a neglect or refusal to renew the contract, upon a course of action on which it entered by his own procurement.

From the facts set forth in the finding, the Superior Court

reached the conclusion that the contract between the parties was terminated on February 28th, 1893. Before that time the plaintiff had determined not to consent to treat it as a continuing one with the New Jersey company. After that time, so far as the Connecticut company, which is the defendant in this cause, is concerned, he had no dealings with it; while so far as the other company is concerned, he gave it prompt notice that he should not and did not consent to a novation; and to this it took no exception.

It may be that his promotion of the scheme of reorganization would have given the New Jersey company, after the transfer of February 28th, an equitable right to insist on his continuance in the small tool department, during the residue of the term of his contract with the defendant. No such right, however, was asserted in its behalf. He notified it that his services were being rendered to it "upon indefinite terms" until they should agree either to make a contract in respect to his further employment, or not to make one; and it did not claim that they stood to each other in any other relation.

While, therefore, there are circumstances (particularly the monthly salary payments) which tend to show that the New Jersey company considered the contract as in force, the Superior Court was justified in finding from all the facts taken together, that it was terminated on February 28th, 1893.

This termination was virtually accomplished by mutual consent. It followed from a transfer of the plant and business, made as part of a scheme which the plaintiff had been active in carrying through, and from his declining to accept a substitution of the new company as his employer. Such a rescission left the defendant under an obligation to pay him the agreed percentage of any profits realized from the January and February sales. The amount of this depended on what might remain after deducting from the proceeds of the sales for that year of goods belonging to the small tool department, certain debits specified in the contract; and of these several were to be ascertained upon a computation of the defendant's expenditures or interest charges for the entire year.

Had the contract been broken by the defendant, the plaintiff would have had a right to sue at once for whatever damages he might have thus sustained. But as it was rescinded by consent, his only right was to recover what remained unpaid of the stipulated compensation for services already performed; the amount of which was to be determined, so far as practicable, by the terms specified in the contract under which they had been rendered.

The stipulated debit of five per cent on the value of the plant of the small tool department, as it might be fixed by the inventory of January 1st, 1893, was evidently intended as an equivalent for a year's interest on the capital thus invested; and in stating the account for a period of only two months, it would be equitable to charge the plaintiff for the proportion due for that period only. But while such a fixed charge would be susceptible of immediate apportionment, this would not be true respecting the debit of a certain fraction of the actual expenses for the year, on such accounts as taxes, insurance, and litigation. Until the year had closed, these items would be incapable of exact computation. It follows that the action, which was instituted in July, 1893, was prematurely brought.

During its pendency, however, and after the close of the year 1893, the complaint was amended by the addition of three new counts. Of these, the fourth and fifth set forth the contract of January 1st, 1889, a sale, on February 28th, 1893, to the New Jersey company, of all the goods then in the small tool department, and sales of other goods in said department during January and February, 1893; and allege that upon an accounting it will be found that the profits upon the latter sales, determined according to the provisions of the contract, will be $10,000, of which ten per cent will be found to be due to the plaintiff. The defendant met these counts with a general denial, excepting only an admission of the execution of the contract, and an averment that on its part it had been duly performed. To the sixth count, in which the additional salary of $2,000, for the year 1893, was claimed, on the ground that the defendant had terminated the contract

by its sale to the New Jersey company, and hence made its renewal of the contract for another term impossible, a demurrer was interposed, founded in part on the ground that the action was prematurely instituted. No such objection having been taken in pleading to the other counts, the parties went to trial on the merits of the case presented by these and were fully heard. Under these circumstances, although the claim that the commissions could not be computed under the terms of the contract until the close of the year, and so that the suit was brought before the cause of action was complete, was made in argument before the trial court, and overruled, it is evident that no substantial injustice was thus done to the defendant.

An action at law can only be supported on the facts existing when it was first brought. It rests on the charge of a breach of duty, for which, at common law, the defendant was liable to immediate arrest and imprisonment. In such a proceeding, if it appears that the plaintiff had suffered no wrong, which would support his suit, when the process was served, there can be no recovery. Equitable proceedings rest upon different foundations, and in them the parties can always rely on new matter, if properly pleaded. The plaintiff asked for both legal and equitable relief, but the latter only was awarded him by the judgment. Had he put the allegations of the fourth or fifth count in the shape of a supplemental complaint, the accounting ordered would have been entirely proper. His failure to present his cause of action in that form, cannot invalidate the judgment unless the defendant was injuriously affected by it. General Statutes, § 1135. Nothing appears upon the record to indicate that such can have been the result. It had full opportunity, under the pleadings as they stood, to offer all testimony and present all claims of which it could have availed itself upon a trial under a supplemental complaint.

The judgment of the Superior Court, in every other particular, is warranted by the facts found; it disposes of the whole controversy between the parties in such a manner as to do substantial justice; and it is not our duty to grant a

new trial for a mere slip in pleading by which no one has been really prejudiced.

Similar considerations must govern the disposition of other well-founded assignments of error. It was held by the Superior Court, upon the facts found, that the transfer of February 28th, 1893, constituted a sale of the goods in the small tool department, though not such a sale as fell within the provisions of the contract; and that this transfer was of itself a termination of the contract by the defendant, which the plaintiff had the right to treat as a wrongful breach of its provisions. These conclusions of law were erroneous, but the resulting judgment was not.

There is no error upon either the plaintiff's or the defendant's appeal.

In this opinion the other judges concurred.