ALBERT H. BARCLAY, TRUSTEE, ET ALS.
*vs.*
CHARLES H. STRONG, EXTR.

Superior Court    New Haven County    File No. 59624

## MEMORANDUM FILED MARCH 9, 1942.

*David Daggett,* of New Haven, for the Plaintiffs.

*Bertram Salzman,* of New Haven, for the Defendant.

O'SULLIVAN, J. In the middle twenties when values were false, profits unrestrained and optimism boundless, a group of gentlemen in the Prospect Hill section of New Haven gathered one evening at the home of Frederick T. Bradley to discuss the wisdom of banding together as a syndicate for the purpose of purchasing certain unimproved land in the. vicinity of their residences. What prompted their assembling was the perfectly natural desire of preserving the neighborhood from deterioration through the erection of houses and other struc-tures not in keeping with the high standard for which that portion of Prospect Street has always been noted. For this was at a time before the city had adopted a zoning ordinance.

The meeting was held on November 8, 1926. In attend-ance were Bradley and eleven of his neighbors. Included in the group were the plaintiff Albert H. Barclay and William T. Barnum. Certain preliminary discussion developed but shortly thereafter the gathering resolved itself into formal status by the election of Bradley as chairman and Barclay as secre-tary, whose original minutes paint a comprehensive picture of what occurred, not only on that evening, but on others when meetings were subsequently held. Barclay, I believe it was, who reported that certain land on the west side of Prospect Street between Huntington and Highland Streets could be pur-chased, he thought, for $55,000 to $58,000. As events later demonstrated, the cost was $59,446. He had previously had prepared a map showing the properties in question and this he had on hand for inspection by the group. Before adjourn-ing, the gathering adopted unanimously the following reso-lutions: "Voted: that those present form a syndicate and con-stitute Fred T. Bradley, Harrison T. Sheldon and Albert H. Barclay a committee with full power to collect subscriptions, negotiate a necessary loan and purchase the land on the west side of Prospect Street between Huntington and Highland Streets at the best possible price and arrange to sell the same to people who would agree to erect one family dwelling houses on the plan of a type that will conform to the rest of the neighborhood.

"Voted: that Messrs. Bradley, Sheldon and Barclay be empowered to either borrow such sums of money as may be necessary to pay interest, taxes and other carrying charges, or raise the sum by assessments against the members of the syndicate as the same are needed."

This committee proceeded to function, as is apparent from the minutes of the next meeting held on November 12, 1926, for in them is found this extract: "Mr. Bradley reported that Mr. Curtis of the Union & New Haven Trust Company had stated that the Trust Company was willing and ready to make the necessary loan to purchase the land....but did not want to take a note signed by twelve makers and suggested that the note be signed by two members of the syndicate and that the remaining members....indemnify the signers."

Apparently, this suggestion appealed to the group because the following resolution was thereafter unanimously passed: "Voted: that upon Mr. Bradley and Mr. Steinbach [one of the members of the syndicate] executing the necessary note to the Union & New Haven Trust Company the remaining subscribers to the syndicate will indemnify the makers of the note against any loss sustained by reason of having signed the necessary note to the Trust Company in proportion to the amount of their subscriptions."

The land which the syndicate had in mind consisted of three parcels. One was owned by a Mrs. Sarah Comen, with whom the committee speedily reached an agreement concerning its purchase. To obtain the cash required to meet the price of $31,460, the trust company was advised that $25,000 would be needed. The company prepared to lend this amount upon a note which, under the resolution of November 12th, was to be executed by Bradley and Steinbach. Bradley did so, but for some unexplained reason, Steinbach declined to sign and Barclay acted in his stead, anticipating that his action would be approved by the syndicate when next it met.

The deal with Mrs. Comen was consummated on November 17th. Title to the property, however, was taken in the name of the trust company as security for the loan. This same procedure was followed when the other two parcels were later purchased.

On November 20th, Barnum gave to Barclay as treasurer or trustee for the syndicate the $1,000 he had agreed to con-

tribute to the venture on the occasion of the first meeting.

The syndicate met next on December 27th, all members save Steinbach being in attendance. After an explanation had been made concerning Barclay's action in signing the note, the following resolution was unanimously adopted: "Voted: that the action of Mr. Bradley and Mr. Barclay in signing a note to The Union & New Haven Trust Company for $25,000 in behalf of the syndicate be approved and that all members of the syndicate execute proper indemnity agreements to save Mr. Bradley and Mr. Barclay from any loss whatsoever by reason of signing this note and any additional notes necessary to purchase the remaining land and any notes for money to pay interest and taxes on the land, and that such indemnity agreements be executed forthwith by each subscriber to the syndicate."

The second parcel, owned by one Shea, was bought for $24,736 on February 4, 1927, and the third, owned by one Penney, was acquired on April 11, 1927, for $3,250. As previously indicated, the total cost of the land was $59,446. The sum was raised partly by the subscriptions of $21,000 and the balance by virtue of a series of notes signed by Bradley and Barclay, acting on behalf of the syndicate.

Although the instrument is dated 1927, it was in fact on December 20, 1926, that Barnum, in conformity with the resolution of December 27th, executed and delivered to the signers of the note his indemnity agreement (Exhibit A).

Bradley and Barclay made diligent efforts to sell the real estate to meet the purpose for which the syndicate had been formed, but without much success. They did, it is true, dispose of a portion of the property by a sale to one Barbour and by another to one Morcaldi. The Barbour sale netted $7,900 which was applied upon the notes, then amounting to $45,912.67, whereby they were reduced to $38,012.67.

The other sale was for $8,500 but the consideration was merely a purchase money mortgage. In 1939, the City of New Haven instituted suit against Morcaldi to foreclose various tax and other liens on the property. Judgment of foreclosure entered on January 5, 1940. On the following May 4th, Barclay requested the trust company to redeem by paying $1,861.13 to the city. Barclay's action in making the request to the trust company received the subsequent approval of the syndi-

cate. In passing, it might be said that every act of the trustees was either authorized in advance or subsequently ratified by the syndicate. It should be noted, however, that Barnum did not attend any of the meetings after 1930, and by 1932 had notified the plaintiffs that he no longer would pay further assessments.

From 1926, the syndicate continued to hold meetings, notices of which were given the membership and on these occasions assessments were voted to meet the overhead charges, consisting of taxes, interest, and a few insignificant items, such as the cost of shoveling snow from the sidewalks around the property.

Barnum paid the following assessments, all of which represented his *pro rata* share of those which had previously been voted:

| | |
|---|---|
| December 30, 1927 | $100 |
| August 16, 1928 | 100 |
| October 24, 1930 | 200 |
| October 20, 1931 | 100 |

His assessment for March, 1932, amounted to $200 but he refused to pay it, taking the position he expressed in a letter to Barclay under date of September 22, 1932 (Exhibit KKK) that "Today is my 74th birthday but in all these years I never made such a blunder as I did when I put one thousand dollars in the 'Prospect Street Association', leaving a thread to entice a hundred dollars out of me every year as long as I live and my heirs forever after." Nor did he pay anything further thereafter.

The following represents his claimed defaults:

| | | |
|---|---|---|
| March, | 1932 | $ 200 |
| February, | 1933 | 100 |
| July, | 1933 | 100 |
| July, | 1934 | 100 |
| January, | 1935 | 100 |
| July, | 1935 | 100 |
| January, | 1936 | 100 |
| September, | 1936 | 100 |
| January, | 1937 | 100 |
| October, | 1937 | 100 |
| January, | 1938 | 100 |

| | | |
|---|---|---|
| January, | 1939 | 100 |
| April, | 1939 | 100 |
| January, | 1940 | 100 |
| April, | 1940 | 100 |
| May, | 1940 | 125 |
| Total | | $1,725 |

On October 10, 1939, Barnum died and the defendant, Strong, qualified as his executor. Bradley died on February 2, 1940, and the plaintiffs, The First National Bank and Trust Company and Seymour M. Bradley, qualified as his executors. On February 29, 1940, The Union & New Haven Trust Company, the holder of Barclay's and Bradley's note, filed a claim against Bradley's estate for the face of his obligations which amounted to $38,012.67 plus interest. The executors allowed the claim in full and on September 10th and 14th, 1940, made a partial payment thereon of $18,012.67.

On May 8, 1940, Barclay and Bradley's executors presented to Strong as Barnum's executor a claim for $3,945.30 plus a "further amount, as yet undetermined, which represents said Barnum's *pro rata* share of said expenses, as may be incurred by said trustees or their successors after April 1, 1940."

The $3,945.30 was broken down as follows: $2,000 on the indemnity agreement (Ex. A); $1,400 on the defaulted assessments to April 1, 1939, which defaults occurred during Barnum's life; $200 on assessments which Strong as executor had failed to honor up to April 1, 1940; and $345.30 which represented interest computed on the instalments which Barnum had neglected to pay.

To explain the size of the note indebtedness to the trust company, it should be observed that the subscriptions of the syndicate amounted to $21,000. The purchase price of all the properties being $59,446, the cash necessary to acquire the land was $38,446. The eventual indebtedness to the bank was $45,912.67, which is $7,446.67 in excess of the cost of the land. This latter sum was the result of the following procedure pursued by the trustees for approximately two and one-half years: when interest and taxes became due during that period, no assessments on the members were made, but the trustees borrowed sufficient additional funds to meet the payments. Hence, the original $38,446 required to consum-

mate the purchase of the properties was enlarged. For ex-
ample, by July 16, 1927, the bank held notes totalling $41,000
and this in turn grew until the eventual limit of $45,912.67
was reached. And, by way of parenthesis, it might well be
added that the trustees' accounts were accurate; nor did either
of them receive any compensation for their time or services.

The complaint is in two counts, the first being predicated
solely on the indemnity agreement (Ex. A), the second being
based on the defaults of Barnum and his executor in meeting
the assessments from October, 1937, to May, 1940, which
total $725. Of this sum, $400 represents those voted by the
syndicate during Barnum's life; the balance, those after his
death.

To each count, six defenses have been addressed. They
are varied and extensive and present several formidable prob-
lems. Indeed, they run the gamut, it would seem, of all
possibilities conceived in the fertile brain of skillful counsel.
One defense, for example, runs to the effect that the action is
premature while another alleges it is too late. But some sim-
plicity may be wrought in writing this memorandum, which
already has transgressed the normal limit of length, if certain
defenses having neither substance nor merit are weeded out.
Thus, the sixth defense to each count, alleging a misunder-
standing on Barnum's part as to the properties which the
syndicate was to purchase, may be ignored, in the face of
failure of proof. Nor is there legal merit to the third, fourth
and fifth defenses to each count, although the reasons there-
fore need not be expressed in view of the conclusions which
have been reached on other phases of the case.

Before exploring the merit of the remaining defenses, the
status of the various members of the syndicate to each other
might, with propriety, be examined to ascertain what prin-
ciples of law shall govern the court in determining their rights
and obligations.

To give a recognized legal name to the group is not essen-
tial, although were this necessary, I would classify it as a joint
adventure. *Dolan vs. Dolan,* 107 Conn. 342. The parties
referred to themselves as a syndicate. But whatever may be
the proper classification, the fact is that the members were
launching upon an enterprise to carry out a single transaction
in which they were all mutually interested and towards the
success of which each contributed an agreed sum of money

and assumed undetermined future financial obligations. Their ultimate goal was not primarily to sell for a profit, although if that occurred, each was to share in it *pro rata*. Their real purpose was to protect the neighborhood and by so doing, prevent its deterioration with an accompanying financial loss.

These factual conclusions, then, seem to be warranted from the evidence:

1. There was a contract entered into by all of the members.

2. Each made a cash contribution although it was not uniform in amount.

3. The contributions were dedicated to the success of the common undertaking and in fact were devoted to the uses and purposes of the enterprise.

4. There was a community of interest between the members in the purpose of the undertaking and an equal right of controlling the conduct of the venture.

Based on the foregoing, I entertain no doubt that while a partnership had not in fact been formed, the law which is applicable to partnerships supplies the rules which must be employed. *Anno.* 48 A.L.R. 1055; 30 *Am. Jur. Joint Adventures* §5.

Passing by, for the moment, the existence of the indemnity agreement, the right of which Bradley and Barclay were possessed when they signed the notes in furtherance of the enterprise, was to be reimbursed for so much of any loss they might experience as exceeded their *pro rata* share of such loss. *Erben vs. Heston,* 202 Pa. 406, 51 Atl. 1025; *Pond vs. Clark,* 24 Conn. 370; 47 *C.J. Partnership* §215; *Wischmeyer vs. Siebeneck,* 46 Oh. App. 486, 189 N.E. 509; *Anno.* 17 *Ann. Cas.* 1022, 1026; 30 *Am Jur. Joint Adventures* §51.

Hence, if Exhibit A had not been executed, Bradley and Barclay could have sought reimbursement from their fellows, each of whom would have been obligated to contribute towards the loss in proportion to the amount of his original subscription.

However, as events moved along, each member executed an agreement to indemnify the signers against loss. As among themselves, these parties had the right to determine the extent of their obligations, one to another. It was simply a matter

of contract. When Barnum gave and Bradley and Barclay accepted Exhibit A, they restricted by agreement the limit of the former's liability to the latter. One may always refine or narrow the extent of his right to reimbursement from another, and in this instance Bradley and Barclay have done so. 30 *Am. Jur. Joint Adventures* §51. Consequently, the extreme limit to which Barnum could be held by the signers of the notes was, by virtue of the agreement, the sum of $2,000. The wording of the agreement, with its embrasive catalogue of the items to be included (note, interest, taxes, assessments, and other expenses) demands the conclusion that the extent of Barnum's liability, whatever it may have been before the agreement was signed, became restricted in scope and any former rights which the signers of the proposed notes may have had were absorbed into the new agreement, or, if beyond its terms, were nullified. This is an instance of the rule that a later agreement entered into between the same parties in re- lation to the same subject matter as the earlier one supersedes the former, where, as it was in the instant case, such was the intention of the parties. "As a general rule, when the new contract is in regard to the same matter and has the same scope as the earlier contract and the terms of the two were inconsistent either in whole or in a substantial part, so that they cannot subsist together, the new contract abrogates the earlier one *in toto* and takes its place, even though there is no express agreement that the new contract shall have that effect." *Riverside Coal Co. vs. American Coal Co.*, 107 Conn. 40, 47.

While from the vantage ground of today, it is easy to be critical of the fairness of the indemnity agreement, it is quite understandable how the minds of the parties were working in 1926. For, as indicated above, those were the days of great optimism, when the forward movement of values was unre- strained and many refused to call on foresightedness to test the worth of projects into which they proposed to move. In- deed, the wording of the agreement indicates a lack of that clarity of expression which deliberate care could have accom- plished. With all deference to the high caliber of eminent lawyers who probably had a hand in phrasing the instrument, one gains the impression that it was probably drafted on the back of a menu during lunch hour. The whole affair was a matter between gentlemen, where legal niceties could be ig- nored. And finally, all undoubtedly had in mind that the equity in the land plus the available reimbursement under

the agreements was entirely ample to protect the signers of the notes, especially where all believed, as they probably did, that a speedy disposition of the property would be attained.

But whether fair or not, their rights and obligations must be found in their agreement. In so holding, it necessarily follows that no consideration need be extended to the second count, based, as it is, on a source other than that found in Exhibit A.

At this point, it is not inappropriate to observe that the plaintiffs in this action, while designated as trustees, are seeking relief for themselves and are not proceeding on behalf of the syndicate, which may or may not have rights against this defendant, but their adjudication is not to be had in this proceeding.

Exhibit A, then, is the instrument whose terms solve the problems raised by the defenses and before attempting to analyze them, it is desirable to examine the exhibit to ascertain what manner of agreement it is.

The agreement is an original undertaking on Barnum's part to protect the purses of Bradley and Barclay. It is an indemnity agreement within the strict definition of that term. It recites that Barnum "for himself, his heirs, executors, administrators, successors and assigns, does hereby covenant and agree to hold said trustees and each of them harmless from any loss which they may sustain by reason of having signed and endorsed said note, said loss to be paid by the indemnitor, however, to be limited to his pro rata share in any loss sustained by reason of the sale of said parcels of land and the application of the proceeds thereof, to the payment of said note with interest and the taxes and any and all assessments and other expenses incurred by the trustees in connection with the purchase and sale of said parcels of land, and said loss, if any, in no event to exceed $2,000."

Indemnity agreements fall broadly into two classes, those where the contract is to indemnify against liability and those where it is to indemnify against loss. *Calamita vs. DePonte,* 122 Conn. 20. The distinction is that recovery cannot be had in the latter until liability is discharged, while under the former the cause of action is complete when a liability attaches. *Morehouse vs. Employers' Liability Assurance Corp.,* 119 Conn. 416.

Not only the language in which the agreement is couched, but the circumstances attending its execution, indicate quite strongly that this indemnity agreement is one against loss rather than liability. The second defense challenges the right of these plaintiffs to bring this action on the ground that they have not sustained a loss and hence, their suit is premature. This, it seems to me, presents an obstacle that the plaintiffs cannot surmount.

In the first place, Barclay has suffered no loss whatsoever and for this reason alone, his action is ill-timed. But in addition to this, both he and Bradley's executors encounter other difficulties springing from the following facts:

It appears that after Bradley's death in 1940, the trust company filed a claim for the full amount of the notes with his executors, who allowed the claim in full and then, on September 10th and 14th made as a partial payment thereon the sum of $18,012.67. However, suit had been instituted on September 5th and service made on the day following, which was four days before Bradley's executors paid anything to the trust company. This being an action at law, the rights of the parties are to be determined as of September 6th at the latest. On that date, none of the plaintiffs had an enforcible right of action. An action at law can only be supported on the facts existing when it was first brought. *Woodbridge vs. Pratt & Whitney Co.,* 69 Conn. 304, 334. This situation, while somewhat technical, is sufficient to preclude recovery.

But there is a far more vital ground for holding the action is premature, and the reason is to be found in the agreement itself. The payment by the executors to the trust company would ordinarily create a loss under the usual indemnity agreement, even though the indemnitee held security to which he might first look, if he so chose, to reimburse himself. *Calamita vs. DePonte, supra; Pothier vs. Reid Air Spring Co..* 103 Conn. 380.

But the agreement has expressly provided the procedure to be followed to determine, first, whether there is to be any loss, and secondly, its amount. Paraphrasing the language used in the agreement, this is what Barnum agreed to: "I agree," he said, "to pay to these plaintiffs any loss, up to $2,000, they may suffer by reason of having signed these notes, but that loss is to be determined by first selling the land and

applying the proceeds to the notes. After doing that, if there is any deficit, taking into consideration not only the face of the notes but all other obligations such as taxes, interest, assessments and other expenses, I shall pay my pro rata share."

The land not having been sold, it is impossible to determine what deficit is to be met. For aught that appears to the contrary, the land may still have such a value that were it applied to the syndicate's indebtedness, no loss at all might be experienced.

It follows, from this line of reasoning, that the action is premature.

And now, having written this tome, and done all that is required of me, may I not make a suggestion that aims at saving others from litigation as well as disposing of the difficulties of the present litigation.

The status of the members of the syndicate, so-called, to one another was such that when one died, the syndicate was dissolved. In this respect, the law of partnership governs. The duty rests on surviving partners to wind up and settle the affairs of the firm. Barnum was first to die. That event terminated the venture. The remaining members should then, it seems to me, have wound up the affair and thus settled with definiteness the extent of the contribution which each was required to make. A note upon this subject which might be examined with profit is to be found in an annotation in 17 *Ann. Cas.* 1022, 1026. *See, also, Anno.* 11 *A.L.R.* 432.

Enter judgment for the defendant.