******************************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.

******************************************************

U.S. BANK NATIONAL ASSOCIATION, TRUSTEE *v.*
ROBIN BLOWERS ET AL.
(SC 20067)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The plaintiff bank, as trustee, sought to foreclose a mortgage on certain
real property owned by, among others, the defendant P. Following P's
default on the mortgage, the plaintiff, through its loan servicing agent,
initiated loan modification negotiations with P, but the parties were
unable to agree on a binding modification. P then contacted the state
Department of Banking, which intervened on his behalf and initiated a
modification, but the plaintiff shortly thereafter increased P's monthly
mortgage payment. Subsequently, the plaintiff commenced a foreclosure
action, and the parties participated in mediation but were unable to reach
an agreement. P then asserted special defenses sounding in equitable
estoppel and unclean hands, as well as certain counterclaims, contending
that the plaintiff engaged in conduct after the note had been executed
that wrongfully and substantially increased P's overall indebtedness,
caused P to incur costs that impeded his ability to cure the default, and
reneged on loan modifications. The plaintiff moved to strike the special
defenses and counterclaims, contending that they were legally insuffi-
cient because they were not related to the making, validity or enforce-
ment of the note or mortgage and were otherwise insufficient to state
a claim on which relief could be granted. The trial court granted the
motion to strike, concluding that the counterclaims did not have a
reasonable nexus to the making, validity or enforcement of the note
because the misconduct alleged related to activities that occurred subse-
quent to the execution of the note or mortgage. The court did not reach
the issue of whether P's allegations were otherwise legally sufficient to
support the counterclaims. The trial court found that P had alleged
sufficient facts to support his special defenses of equitable estoppel and
unclean hands, but, because P did not allege that the parties had agreed
to a modification of the loan postforeclosure and could not rely on
postforeclosure conduct to support his special defenses, they were
legally insufficient, as they did not directly relate to the making, validity
or enforcement of the note or mortgage. The trial court rendered judg-
ment of strict foreclosure, from which P appealed to the Appellate Court.
The Appellate Court rejected P's request to abandon the making, validity
or enforcement test in favor of the transactional test, set forth in the
rules of practice (§ 10-10), that requires that counterclaims must arise
out of the transaction that is the subject of the plaintiff's complaint.
The Appellate Court affirmed the trial court's judgment, and P, on the
granting of certification, appealed to this court. *Held* that the Appellate
Court incorrectly concluded that P's allegations, made in connection
with his special defenses and counterclaims, did not provide a legally
sufficient basis for those defenses and counterclaims, as P's allegations
involved the types of misconduct that bore a sufficient connection to
the enforcement of the note or the mortgage, and to the extent that the
pleadings could be construed to allege that the intervention by the
Department of Banking resulted in a binding loan modification, the
breach of such an agreement also provided a sufficient basis to withstand
a motion to strike in a foreclosure action; accordingly, the judgment of
the Appellate Court was reversed, and the case was remanded with
direction to reverse the judgment of strict foreclosure and for further pro-
ceedings.

Argued December 11, 2018—officially released August 13, 2019

*Procedural History*

Action to foreclose a mortgage on certain prop-
erty owned by the named defendant et al., brought to
the Superior Court in the judicial district of Hartford,

where the defendant Farmington Valley Landscape, LLC, et al. were defaulted for failure to appear; thereafter, the defendant C&I Solutions, LLC, was defaulted for failure to plead; subsequently, the named defendant et al. filed special defenses and counterclaims; thereafter, the court, *Dubay*, *J.*, granted the plaintiff's motion to strike the special defenses and counterclaims; subsequently, the court, *Wahla*, *J.*, granted the plaintiff's motion for judgment on the counterclaims, the court, *Peck*, *J.*, granted the plaintiff's motion for summary judgment as to liability and the court, *Wahla*, *J.*, granted the plaintiff's motion for judgment of strict foreclosure and rendered judgment thereon, from which the defendant Mitchell Piper appealed to the Appellate Court, *Alvord* and *Pellegrino*, *Js.*, with *Prescott*, *J.*, dissenting, which affirmed the trial court's judgment, and the defendant Mitchell Piper, on the granting of certification, appealed to this court. *Reversed*; *further proceedings*.

*Eli Jacobs* and *Michael Linden*, certified legal interns, with whom were *Jeffrey Gentes* and, on the brief, *J.L. Pottenger*, *Jr.*, and *Jessica Lefebvre*, *Victoria Stilwell*, *Anderson Tuggle*, and *Emily Wanger*, certified legal interns, for the appellant (defendant Mitchell Piper).

*Pierre-Yves Kolakowski*, with whom was *Zachary Grendi*, for the appellee (plaintiff).

*Opinion*

McDONALD, J. This certified appeal calls upon the court to decide whether allegations that a mortgagee engaged in a pattern of misrepresentation and delay in postdefault loan modification negotiations before and after initiating a foreclosure action—thereby adding to the mortgagor's debt and frustrating the mortgagor's ability to avoid foreclosure—can establish legally sufficient special defenses and counterclaims in that action. The defendant mortgagor, Mitchell Piper,[1] appeals from the judgment of the Appellate Court affirming the trial court's judgment of strict foreclosure in favor of the plaintiff mortgagee, U.S. Bank National Association,[2] following the trial court's decision striking the defendant's special defenses and counterclaims. See *U.S. Bank National Assn.* v. *Blowers*, 177 Conn. App. 622, 638, 172 A.3d 837 (2017). The defendant's principal claim is that the Appellate Court incorrectly concluded that such allegations cannot establish legally sufficient special defenses or counterclaims because the misconduct alleged does not relate to the making, validity, or enforcement of the note or mortgage. We agree with the defendant and reverse the Appellate Court's judgment.

The record reveals the following undisputed background facts. In August, 2005, the defendant executed a promissory note in exchange for a loan in the original principal amount of $488,000. The plaintiff subsequently became the holder of the note. The note was secured by a mortgage on the defendant's real property in Avon, and the mortgage was assigned to the plaintiff in 2010. The defendant defaulted on the note in January, 2010.

In February, 2014, the plaintiff commenced the present foreclosure action. Upon the defendant's election, the parties participated in the state's court-supervised foreclosure mediation program; see General Statutes §§ 49-31k through 49-31o;[3] but were unable to reach a loan modification agreement during that process. The defendant thereafter filed an answer, special defenses, and counterclaims. The special defenses sounded in equitable estoppel and unclean hands; the counterclaims sounded in negligence and violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.[4]

The defendant alleged the following facts in support of all of his special defenses and counterclaims. In early 2010, the defendant fell behind on his mortgage payments due to decreased business revenue resulting from the "Great Recession."[5] Shortly thereafter, the plaintiff, through its servicing agent,[6] reached out to the defendant and offered him a rate reduction that would result in a monthly mortgage payment of $1950.[7] After the defendant successfully completed a three month trial modification period, the plaintiff informed the defendant that the reduced monthly amount previously

offered was too low. Thereafter, over an approximately two year period, the plaintiff similarly offered and reneged on at least four additional modifications after accepting trial payments from the defendant. Each successive modification offer sharply increased the defendant's monthly payment, rising from the initial proposal of $1950 to approximately $3445.

In April, 2012, the defendant contacted the state's Department of Banking,[8] which intervened on the defendant's behalf, "resulting in an immediate modification being received." Within months, however, the plaintiff notified the defendant that his monthly payment was increasing nearly 20 percent from that modified payment. The defendant was unable to afford the increased payments but continued to make the monthly payment set by the April modification until October, 2012, when the plaintiff rejected them as " 'partial' " payments.

In late 2013, the plaintiff erroneously informed the defendant's insurance company that the Avon property was no longer being used as the defendant's residence. As a result, the defendant's insurance policy was cancelled, and the defendant was forced to replace coverage at premium costs that increased from his prior rate of $900 to $4000 per year.

The defendant also alleged that the following conduct occurred after the February, 2014 commencement of the foreclosure action, during the parties' participation in court-supervised mediation. In the course of approximately ten months of mediation, the plaintiff regularly ignored agreed upon deadlines, arrived late to mediation sessions, made duplicative, exhaustive, and ever changing requests, and provided the defendant with conflicting or incomplete information. Due to the plaintiff's tardiness, little was accomplished during mediation sessions given the time constraints of the program's scheduling. Although the plaintiff offered a modification at one point, it could not be finalized because the financial information on which it rested was more than four months out of date by the time it was presented to the defendant.

The defendant alleged that the foregoing preforeclosure and postforeclosure misconduct not only frustrated his ability to obtain a proper modification but also caused thousands of dollars in additional accrued interest, attorney's fees, escrow advances, and other costs to be added to the debt claimed by the plaintiff in the foreclosure action. In his negligence counterclaim, the defendant further alleged that the unnecessary and negligent prolonging of this process had ruined his credit score, which adversely impacted his business and personal affairs, and had caused him to incur significant expenses for legal representation and other professional services. The defendant claimed that the plaintiff should be equitably estopped from collecting the damages it caused by its own misconduct and that the plain-

tiff's attempt to foreclose should be barred by the doctrine of unclean hands. He further sought compensatory and punitive damages, injunctive relief, and attorney's fees under his counterclaims.

The plaintiff moved to strike all of the special defenses and counterclaims. It contended that they were legally insufficient because they were not related to the making, validity, or enforcement of the note, as required under appellate precedent, and also were otherwise insufficient to state a claim upon which relief may be granted. The trial court, *Dubay, J.*, granted the motion to strike in its entirety.

With respect to the counterclaims, the trial court explained that the proper application of Practice Book § 10-10, which dictates that counterclaims must "[arise] out of the transaction [that] is the subject of the plaintiff's complaint," requires, in the foreclosure context, consideration of whether the counterclaim has some reasonable nexus to the making, validity, or enforcement of the note. The court concluded that this test was not met in the present case because all of the misconduct alleged related to activities that took place subsequent to the execution of the note or mortgage. The court acknowledged that a foreclosure sought after a modification had been reached during mediation could have the requisite nexus to enforcement of the note, but found that there had been no such modification in the present case. In light of its conclusion that the allegations did not establish this nexus, the court did not reach the issue of whether they were otherwise legally sufficient to support the CUTPA and negligence counterclaims.

Conversely, with respect to the special defenses, the trial court found that the defendant had alleged sufficient facts to support equitable estoppel and unclean hands defenses. It cited, however, Appellate Court case law under which "[a] valid special defense at law to a foreclosure proceeding must be legally sufficient *and* address the making, validity or enforcement of the mortgage, the note or both." (Emphasis added; internal quotation marks omitted.) *TD Bank, N.A.* v. *J & M Holdings, LLC*, 143 Conn. App. 340, 343, 70 A.3d 156 (2013). As with the counterclaims, the court concluded that, because the defendant did not allege that the parties had agreed to a modification of the loan postforeclosure, he could not rely on postforeclosure conduct to support his special defenses. Therefore, the trial held that the special defenses were legally insufficient because they did not directly relate to the making, validity or enforcement of the note. The trial court, *Wahla, J.*, subsequently rendered a judgment of strict foreclosure.

The defendant appealed from the judgment of strict foreclosure to the Appellate Court, challenging the trial court's decision granting the plaintiff's motion to strike. The Appellate Court panel, with one judge dissenting,

affirmed the judgment. *U.S. Bank National Assn.* v. *Blowers*, supra, 177 Conn. App. 638. The Appellate Court majority agreed that the special defenses and counterclaims did not satisfy the making, validity, or enforcement test as required under its precedent. Id., 627–32. It rejected the defendant's request to abandon this test in favor of a straightforward application of the standard transactional test applied in other settings. Id., 633–34. The majority reasoned that "automatically allowing counterclaims and special defenses in foreclosure actions that are based on conduct of the mortgagee arising during mediation and loan modification negotiations would serve to deter mortgagees from participating in these crucial mitigating processes" and would thwart judicial economy. Id., 634. It disagreed that its test was inconsistent with the equitable nature of foreclosure, noting that exceptions to the test's application had been recognized when traditional notions of equity would not be served thereby. Id., 633–34. The majority further noted that mortgagors who do not meet such limited exceptions are not without a remedy for a mortgagee's postdefault misconduct because a mortgagor could bring a separate action for damages. Id., 634 n.5. The dissenting judge contended that the court's precedent did not stand for the sweeping proposition that allegations of improper conduct during mediation and modification negotiations lack a reasonable nexus to the making, validity, or enforcement of the note or mortgage. Id., 647 (*Prescott, J.*, dissenting). The dissenting judge recognized that the court previously had concluded that allegations of misconduct during the court-sponsored mediation program lacked such a nexus. Id., 647 (*Prescott, J.*, dissenting). The present case, however, also alleged preforeclosure misconduct, including that the defendant had "received" an "immediate" modification as a result of the intervention of the Department of Banking, an allegation that should have been accepted as true for purposes of the motion to strike. Id., 646–47 (*Prescott, J.*, dissenting).

The defendant's certified appeal to this court followed. The defendant challenges the propriety of the making, validity, or enforcement test, the proper scope of "enforcement" under that test if it does apply to foreclosure actions, and the sufficiency of the allegations to establish that the parties had entered into a binding modification if such allegations are necessary to seek equitable relief on the basis of postorigination conduct.[9]

At its essence, the defendant's position is that, given the equitable nature of a foreclosure action, a mortgagee's misconduct that hinders a mortgagor's efforts to cure a default, such as through obtaining a modification agreement, and adds to the mortgagor's debt while the mortgagor is making such good faith efforts, is a proper basis for special defenses or counterclaims in that action. Although the defendant suggests that the stan-

dard test set forth in our rules of practice should be the sole measure of legal sufficiency, he contends that such misconduct sufficiently relates to enforcement of the note or mortgage if the making, validity, or enforcement test is applied. We conclude that the Appellate Court's judgment must be reversed.

We begin with the observation that the "making, validity, or enforcement test" is a legal creation of uncertain origin, but it has taken root as the accepted general rule in the Superior and Appellate Courts over the past two decades.[10] Its scope, however, has been the subject of some debate in those courts.[11] This court has never expressly endorsed this test. Our lone reference to it was in a case in which we acknowledged that the mortgagee had argued that the mortgagor's equitable special defense did not meet this test; see *Thompson* v. *Orcutt*, 257 Conn. 301, 312, 777 A.2d 670 (2001); but we resolved the case in favor of the mortgagor by application of a different standard. Id., 313.

In reaching our decision, we presume that the Appellate Court did not intend for the making, validity, or enforcement test to require mortgagors to meet a more stringent test than that required for special defenses and counterclaims in nonforeclosure actions. We therefore interpret the test as nothing more than a practical application of the standard rules of practice that apply to all civil actions to the specific context of foreclosure actions. See *CitiMortgage, Inc.* v. *Rey*, 150 Conn. App. 595, 605, 92 A.3d 278 ("a counterclaim must simply have a sufficient relationship to the making, validity or enforcement of the subject note or mortgage in order to meet the transaction test as set forth in Practice Book § 10-10 and the policy considerations it reflects"), cert. denied, 314 Conn. 905, 99 A.3d 635 (2014). We agree with the defendant and the dissenting Appellate Court judge that a proper construction of "enforcement" includes allegations of harm resulting from a mortgagee's wrongful postorigination conduct in negotiating loan modifications, when such conduct is alleged to have materially added to the debt and substantially prevented the mortgagor from curing the default.[12]

I

Appellate review of a trial court's decision to grant a motion to strike is plenary. See, e.g., *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 398, 119 A.3d 462 (2015); *Kumah* v. *Brown*, 307 Conn. 620, 626, 58 A.3d 247 (2013). This is because "a motion to strike challenges the legal sufficiency of a pleading . . . and, consequently, requires no factual findings by the trial court . . . . In ruling on a motion to strike, the court must accept as true the facts alleged in the special defenses and construe them in the manner most favorable to sustaining their legal sufficiency." (Internal quotation marks omitted.) *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 398; see also *Kaminski* v. *Fair-*

*field*, 216 Conn. 29, 31, 578 A.2d 1048 (1990). "The allegations of the pleading involved are entitled to the same favorable construction a trier would be required to give in admitting evidence under them and if the facts provable under its allegations would support a defense or a cause of action, the motion to strike must fail." *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 108–109, 491 A.2d 368 (1985).

The defendant's allegations are not a model of clarity. The ambiguity in the defendant's pleadings is exacerbated by the fact that the defendant has alleged the very same facts in support of various special defenses and counterclaims that require different elements. On one hand, the defendant may be asserting that he satisfied all of the conditions necessary to transition from temporary modifications to permanent modifications but that no such permanent modification was executed. On the other hand, he may be asserting that, even though the plaintiff was not obligated to execute a permanent modification, it induced the defendant to believe that a permanent modification would be executed and engaged in the negotiations in bad faith because it delayed foreclosure with the purpose or effect of extracting additional funds from the defendant, or increasing the defendant's debt.[13] It is also possible that the defendant may be advancing both of these arguments as alternative theories. Given the posture of the case, an early stage of litigation, and the obligation to construe the pleadings in the defendant's favor, we assume that the defendant is advancing all of these theories.

Finally, before turning to the merits of the appeal, we emphasize the narrow scope of the issue before us. The trial court concluded that the allegations in support of both special defenses of unclean hands and equitable estoppel were legally sufficient, but for the requisite direct connection to the making, validity, or enforcement of the note or mortgage. The court never decided whether the counterclaims adequately stated a claim upon which relief may be granted, resting its conclusion solely on the lack of the requisite connection to enforcement of the note or mortgage. We assume, for purposes of this opinion, that both the defenses and counterclaims would otherwise be legally sufficient and limit our review to the question of whether the allegations bear a sufficient connection to enforcement of the note or mortgage.[14] The meaning of enforcement in this context presents an issue of law over which we also exercise plenary review. See *CitiMortgage, Inc.* v. *Rey*, supra, 150 Conn. App. 602 (plenary review applies to question of which legal standard controls and whether proper standard was applied).

## II

Our view of the scope of "enforcement" of the note or mortgage is informed by the following principles. An

action for foreclosure is "peculiarly an equitable action . . . ." *Hartford Federal Savings & Loan Assn.* v. *Lenczyk*, 153 Conn. 457, 463, 217 A.2d 694 (1966); accord *New Milford Savings Bank* v. *Jajer*, 244 Conn. 251, 256, 708 A.2d 1378 (1998). "A party that invokes a court's equitable jurisdiction by filing an action for foreclosure necessarily invites the court to undertake . . . an inquiry [into his conduct]." *Willow Funding Co., L.P.* v. *Grencom Associates*, 63 Conn. App. 832, 849, 779 A.2d 174 (2001); accord *Basak* v. *Damutz*, 105 Conn. 378, 385, 135 A. 453 (1926) (in court of equity, "the conduct of the plaintiff is subject to scrutiny, since he who claims equity must do equity"). "Equity will not afford its aid to one who by his conduct or neglect has put the other party in a situation in which it would be inequitable to place him." *Glotzer* v. *Keyes*, 125 Conn. 227, 231–32, 5 A.2d 1 (1939). A trial court conducting an equitable proceeding may therefore "consider all relevant circumstances to ensure that complete justice is done." *Reynolds* v. *Ramos*, 188 Conn. 316, 320, 449 A.2d 182 (1982). When a mortgagee's conduct is inequitable, "a trial court in foreclosure proceedings has discretion . . . to withhold foreclosure or to reduce the amount of the stated indebtedness." *Hamm* v. *Taylor*, 180 Conn. 491, 497, 429 A.2d 946 (1980); accord *Southbridge Associates, LLC* v. *Garofalo*, 53 Conn. App. 11, 15, 728 A.2d 1114, cert. denied, 249 Conn. 919, 733 A.2d 229 (1999).

This court previously has declined to take a narrow view of the circumstances under which equitable defenses may be asserted in a foreclosure action. In *Thompson* v. *Orcutt*, supra, 257 Conn. 318, the court held that the mortgagor's special defense of unclean hands, which rested on actions by the mortgagee subsequent to the execution of the note and mortgage, was legally sufficient. In that case, the mortgagee was alleged to have engaged in fraudulent conduct in a bankruptcy proceeding, which, in turn, enabled the mortgagee to pursue the foreclosure action. Id., 304–305. Specifically, the mortgagee was alleged to have intentionally overstated the extent to which the mortgage encumbered the property, which caused the bankruptcy trustee to abandon the property as an asset of the bankruptcy estate. Id., 304. Before this court, the mortgagee argued that an unclean hands defense should not apply in a mortgage foreclosure action unless the wrongful conduct relates to the making, validity, or enforcement of the mortgage or note. Id., 312. It contended, therefore, that the mortgagor could not assert this defense because the mortgage transaction was not premised on fraud but, rather, the alleged fraud had been undertaken in the bankruptcy action. Id. This court rejected the mortgagee's narrow view. Id., 312–14. It concluded that the mortgagee's alleged misconduct was " 'directly and inseparably connected' " to the foreclosure action and, therefore, was sufficient to support the unclean hands

defense to the foreclosure action. Id., 313, 318. In so concluding, this court explained that, although "[t]he original transaction creating the . . . mortgage was not tainted with fraud . . . the plaintiff's ability to foreclose on the defendants' property . . . depended upon his fraudulent conduct in the bankruptcy proceeding." Id., 313–14.

Although *Thompson* is silent on precisely when the alleged misconduct occurred, appellate case law recognizes that conduct occurring after the origination of the loan, after default, and even after the initiation of the foreclosure action may form a proper basis for defenses in a foreclosure action. See *McKeever* v. *Fiore*, 78 Conn. App. 783, 789–90, 829 A.2d 846 (2003) (applying doctrine of unclean hands to reduce interest accrued and attorney's fees incurred over nine year period between plaintiff's initial commencement of foreclosure action and final prosecution of action); *Federal Deposit Ins. Corp.* v. *Voll*, 38 Conn. App. 198, 211, 660 A.2d 358 (concluding that equitable defense of laches, based on delay between commencement of foreclosure action and motion for judgment of foreclosure, could have been asserted in responsive pleading or in objection to calculation of debt when plaintiff moved for judgment of foreclosure, and, therefore, laches argument could not be raised in proceeding for deficiency judgment), cert. denied, 235 Conn. 903, 665 A.2d 901 (1995).

This broader temporal scope is consistent with the principle that, in equitable actions, "the facts determinative of the rights of the parties are those in existence at the time of final hearing." *Greenwich Trust Co.* v. *Tyson*, 129 Conn. 211, 215, 27 A.2d 166 (1942); accord *E. M. Loew's Enterprises, Inc.* v. *International Alliance of Theatrical Stage Employees*, 127 Conn. 415, 419, 17 A.2d 525 (1941) (whether plaintiff is entitled to equitable relief is determined "not by the situation existing when [the action] is begun, but by that which is developed at the trial"); *Duessel* v. *Proch*, 78 Conn. 343, 350, 62 A. 152 (1905) ("[i]n equitable proceedings, any events occurring after their institution may be pleaded and proved which go to show where the equity of the case lies at the time of the final hearing"). "Equitable proceedings rest upon different foundations [than actions at law], and in them the parties can always rely on new matter, if properly pleaded." *Woodbridge* v. *Pratt & Whitney Co.*, 69 Conn. 304, 334, 37 A. 688 (1897); see Practice Book § 10-10 ("[s]upplemental pleadings showing matters arising since the original pleading may be filed in actions for equitable relief by either party").

This broader temporal scope is not inconsistent with a requirement that a defense sufficiently relates to enforcement of the note or mortgage. The various rights of the mortgagee under the note and mortgage (or related security instruments) are not finally or completely "enforced" until the foreclosure action is con-

cluded. See General Statutes § 49-1 (setting forth general rule that "[t]he foreclosure of a mortgage is a bar to any further action upon the mortgage debt, note or obligation against the person or persons who are liable for the payment thereof who are made parties to the foreclosure"); *JP Morgan Chase Bank, N.A. v. Winthrop Properties, LLC*, 312 Conn. 662, 673–74, 94 A.3d 622 (2014) ("The purpose of the foreclosure is to extinguish the mortgagor's equitable right of redemption that he retained when he granted legal title to his property to the mortgagee following the execution of the mortgage. . . . The mortgagee's title does not become absolute, however, until all eligible parties have failed to exercise their rights to redeem the property." [Citations omitted.]); *RAL Management, Inc. v. Valley View Associates*, 278 Conn. 672, 685 n.12, 899 A.2d 586 (2006) (amended affidavit of debt filed on day that court reentered judgment of foreclosure, when it set new law days).

The mortgagor's rights and liabilities thus depend not only on the validity of the note and mortgage but also on the amount of the debt. That debt will determine whether strict foreclosure or foreclosure by sale is ordered, and, in turn, whether a deficiency judgment may be recovered and the amount of that deficiency. See *Equity One, Inc. v. Shivers*, 310 Conn. 119, 131, 74 A.3d 1225, 1233 (2013) ("under Practice Book § 23-18, the court was required to review the note, mortgage and affidavit of debt before finding that the debt exceeded the value of the property and ordering strict foreclosure"); *Federal Deposit Ins. Corp. v. Voll*, supra, 38 Conn. App. 207 (deficiency judgment allows note holder to "recover the difference between the amount due on the underlying debt and the amount received upon foreclosure" [internal quotation marks omitted]); see also *TD Bank, N.A. v. Doran*, 162 Conn. App. 460, 468, 131 A.3d 288 (2016) ("the strict foreclosure hearing establishes the amount of the debt owed by the defendant"); *Federal Deposit Ins. Corp. v. Voll*, supra, 211 ("[d]efenses that could have been raised during the foreclosure proceedings may not be raised at the deficiency hearing"); *Connecticut National Bank v. N. E. Owen II, Inc.*, 22 Conn. App. 468, 472, 578 A.2d 655 (1990) ("in a mortgage foreclosure action, a fundamental allegation that must be proved by the plaintiff is the amount of the debt"). The debt may include principal, interest, taxes, and late charges owed. See, e.g., *New England Savings Bank v. Bedford Realty Corp.*, 238 Conn. 745, 748 and n.3, 680 A.2d 301 (1996); *Suffield Bank v. Berman*, 228 Conn. 766, 769 and n.9, 773, 639 A.2d 1033 (1994); *Burritt Mutual Savings Bank of New Britain v. Tucker*, 183 Conn. 369, 374, 439 A.2d 396 (1981); *Connecticut National Bank v. N. E. Owen II, Inc.*, supra, 469; see also General Statutes § 49-2 (a); Practice Book § 23-18. The terms of the note or mortgage may also permit an award of reasonable attorney's

fees for expenses arising from any controversy relating to the note or mortgage, which may be collected in connection with the foreclosure action. See *Connecticut National Bank* v. *N. E. Owen II, Inc.*, supra, 470–71 and n.3; 1 D. Caron & G. Milne, Connecticut Foreclosures (9th Ed. 2019) § 6-2:1.2k, p. 419.

These equitable and practical considerations inexorably lead to the conclusion that allegations that the mortgagee has engaged in conduct that wrongly and substantially increased the mortgagor's overall indebtedness, caused the mortgagor to incur costs that impeded the mortgagor from curing the default, or reneged upon modifications are the types of misconduct that are " 'directly and inseparably connected' "; *Thompson* v. *Orcutt*, supra, 257 Conn. 313; to enforcement of the note and mortgage. To the extent that the pleadings reasonably may be construed to allege that the April, 2012 intervention by the Department of Banking resulted in a binding modification, there can be no doubt that the breach of such an agreement would bear the requisite nexus.[15] See *U.S. Bank National Assn.* v. *Blowers*, supra, 177 Conn. App. 630 (acknowledging this point). Such allegations, therefore, provide a legally sufficient basis for special defenses in the foreclosure action. Insofar as the counterclaims rest, at this stage, upon the same allegations as the special defenses, judicial economy would certainly weigh in favor of their inclusion in the present action. See *Connecticut National Bank* v. *Voog*, 233 Conn. 352, 368, 659 A.2d 172 (1995) ("[b]ecause th[ese] counterclaim[s] paralleled his special defense, [they were] also correctly pleaded in this case rather than as a separate action for damages").

We express no opinion as to whether all of the defendant's allegations necessarily have a sufficient nexus to enforcement of the note or mortgage. Because the trial court, the Appellate Court, and the parties have generally addressed the allegations in toto, we do the same.[16]

Nor do we intend to suggest, at this stage of the litigation, that the allegations in the present case are sufficient to justify the remedy of withholding foreclosure or reducing the debt. Even if the defendant is able to prove all of his allegations, the trial court would have to be mindful that "[t]he equitable powers of the court are broad, but they are not without limit. 'Equitable power must be exercised equitably.' *Hamm* v. *Taylor*, supra, 180 Conn. 497." *McKeever* v. *Fiore*, supra, 78 Conn. App. 793; see also *Wells Fargo Bank, N.A.* v. *Meyers*, 108 App. Div. 3d 9, 23, 966 N.Y.S.2d 108 (2013) (it was improper for trial court to order mortgagee to execute final loan modification patterned after trial loan modification proposal as remedy for mortgagee's failure to negotiate loan modification in good faith and to direct dismissal of complaint, and "courts must employ appro-

priate, permissible, and authorized remedies, tailored to the circumstances of each given case" when no sanction is specifically directed). It would be premature for us to express an opinion on that matter at this juncture.

We are not persuaded that our decision today will have the adverse consequences envisioned by the plaintiff and the Appellate Court that would require a different result as a matter of public policy. On this record, we have no basis to conclude that mortgagees will be deterred from engaging in modification negotiations. Under the state's mediation program, when a mortgagor elects to participate in the program, a mortgagee is required to engage in loss mitigation review with the mortgagor before foreclosure proceedings can proceed and faces sanctions for conduct that amounts to a lack of good faith.[17] See General Statutes §§ 49-31*l* and 49-31n. This statutory obligation provides an incentive for the parties to negotiate prior to the filing of a foreclosure action, as do ordinary financial incentives. Our decision serves as a deterrent to wrongful conduct only. Insofar as the mortgagee is conducting itself fairly and within the bounds of the law, we agree with the dissenting Appellate Court judge's confidence that "our trial courts will be able to discern efficiently between claims that are well pleaded and supported by specific factual allegations and those that are merely frivolous and intended only to create unneeded delay." *U.S. Bank National Assn.* v. *Blowers*, supra, 177 Conn. App. 649 (*Prescott*, *J.*, dissenting).

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of strict foreclosure and to remand the case to the trial court for further proceedings in accordance with this opinion.

In this opinion the other justices concurred.

[1] Robin Blowers, Farmington Valley Landscape, LLC (Farmington), Land Rover Capital Group (Land Rover), C&I Solutions, LLC, and Viking Fuel Oil Company, Inc. (Viking), also were named as defendants in this foreclosure action. Farmington, Land Rover and Viking were defaulted for failure to appear, and the remaining defendants other than Piper declined to appeal from the trial court's judgment. For convenience, we refer to Piper as the defendant.

[2] The full name of the plaintiff is U.S. Bank National Association, as Trustee for the Holders of the First Franklin Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-FF10.

[3] In 2008, the legislature established a court-administered and supervised foreclosure mediation program under which neutral mediators assist eligible homeowners facing foreclosure and their lenders or mortgage servicers to achieve a mutually agreeable resolution to a foreclosure action. See General Statutes §§ 49-31k through 49-31o. Mediation "shall . . . address all issues of foreclosure," including, but not limited to, restructuring of the mortgage debt. General Statutes § 49-31m. When a mortgagor elects to participate in the program, the mortgagee is obligated to engage in some form of loss mitigation review with the mortgagor before foreclosure proceedings can proceed. See General Statutes §§ 49-31*l* and 49-31n.

Although §§ 49-31k, 49-31*l* and 49-31n have been amended by the legislature since the events underlying the present case; see, e.g., Public Acts 2015, No. 15-124; those amendments have no bearing on the merits of this appeal.

[4] The defendant also asserted an unjust enrichment special defense and counterclaim but subsequently withdrew both.

[5] "The Great Recession began in December 2007 and ended in June 2009, which makes it the longest recession since World War II. Beyond its duration, the Great Recession was notably severe in several respects. . . . Home prices fell approximately 30 percent, on average, from their mid-2006 peak to mid-2009, while the S&P 500 index fell 57 percent from its October 2007 peak to its trough in March 2009." R. Rich, "The Great Recession," available at https://www.federalreservehistory.org/essays/great recession of 200709 (last visited July 23, 2019). As foreclosure actions soared; see generally *Equity One, Inc.* v. *Shivers*, 310 Conn. 119, 145 n.7, 74 A.3d 1225 (2013) (*McDonald, J.*, dissenting) (noting mortgage foreclosure crisis during this period); state and federal legislators stepped in to attempt to staunch the tide. See footnote 3 of this opinion (addressing Connecticut's legislative response).

[6] Because there is no dispute that the plaintiff's servicing agent was acting within the scope of its agency with respect to the conduct alleged, we impute all of the servicer's conduct to the plaintiff in this opinion.

[7] Nothing in the record indicates the amount of the defendant's mortgage payment at the time of default.

[8] The defendant alleges that he contacted the state "banking commission." Because Connecticut does not have a banking commission, we construe the defendant's allegation to mean that he contacted the state's Department of Banking.

[9] We granted the defendant's petition for certification to appeal, limited to the following issues:

"1. Did the Appellate Court properly hold that (a) special defenses to a foreclosure action must 'directly attack' the making, validity, or enforcement of the note or mortgage, and (b) counterclaims in a foreclosure action must also satisfy the 'making, validity, or enforcement' requirement? See Practice Book § 10-10.

"2. If the Appellate Court properly addressed the issues in the first question, did it properly hold that alleged postorigination misconduct concerns a plaintiff's 'enforcement' of a note or mortgage only if the plaintiff breaches a loan modification or other similar agreement that affects the enforceability of the note or mortgage?

"3. If the Appellate Court properly addressed the issues in the first and second questions, did it properly hold that the [defendant's] allegations of the plaintiff's misconduct and breach relating to a 'received' 'immediate modification' did not amount to an allegation that the plaintiff had agreed to a 'final, binding loan modification' that affected the plaintiff's ability to enforce the note or mortgage?" *U.S. Bank National Assn.* v. *Blowers*, 328 Conn. 904, 904–905, 177 A.3d 1160 (2018).

[10] Our research reveals that the limitation applied in the present case first appeared in Connecticut jurisprudence in a Superior Court case. In *Connecticut Savings Bank* v. *Reilly*, 12 Conn. Supp. 327, 327–28 (1944), a foreclosure action, the defendant asserted abuse of process as a special defense, due to the excessiveness of attachment with which suit was commenced. With regard to that special defense, the trial court, in a brief two paragraph decision, noted that abuse of process did not fall within the ambit of defenses this court had recognized at common law—payment, discharge, release, satisfaction or invalidity of the lien. Id., 327. The trial court determined, in a separate memorandum of decision in that same foreclosure action, that the defendant's counterclaim "sounds in tort and its subject matter has no connection with the making, validity or enforcement of the mortgage. This makes it an improper matter for adjudication in this litigation." *Connecticut Savings Bank* v. *Reilly*, 12 Conn. Supp. 328, 329 (1944). In support of this proposition, the trial court cited *Schaefer* v. *O. K. Tool Co.*, 110 Conn. 528, 148 A. 330 (1930), a case in which this court simply had held that it is not permissible to file a counterclaim sounding in tort in a contract action unless the subject matter of the counterclaim is so connected with the matter in controversy under the original complaint that its consideration is necessary for a full determination of the rights of the parties. Id., 531; see *Connecticut Savings Bank* v. *Reilly*, supra, 329. Our research has not revealed any reference to, or application of, the making, validity, or enforcement test until almost five decades later. In a 1990 foreclosure action, the trial court concluded that special defenses and counterclaims alleging tortious interference with a contract to sell the subject property could not proceed because they did not involve the validity and enforcement of promissory notes, a guarantee and mortgages. See *Citytrust* v. *Kings Gate Developers, Inc.*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-90-0106448-S (October 18, 1990) (2 Conn. L. Rptr. 639). That

case did not rely on either *Reilly* decision but, instead, relied on *Wallingford* v. *Glen Valley Associates, Inc.*, 190 Conn. 158, 161, 459 A.2d 525 (1983), a case that makes no reference to a making, validity, or enforcement test. *Citytrust* v. *King Gate Developers, Inc.*, supra, 2 Conn. L. Rptr. 639; see *Wallingford* v. *Glen Valley Associates, Inc.*, supra, 159, 160–61 (applying transaction test set forth in what is now Practice Book § 10-10 to conclude that counterclaim alleging tort claim for property damage resulting from surface water diversion did not involve same factual and legal issues as plaintiff's sewer and tax lien foreclosure action, which involved "enforcement of a lien acquired by operation of law").

It appears that this test first entered our appellate foreclosure jurisprudence in 1999. See *Southbridge Associates, LLC* v. *Garofalo*, 53 Conn. App. 11, 17–19, 728 A.2d 1114, cert. denied, 249 Conn. 919, 733 A.2d 229 (1999). The Appellate Court in *Garofalo* did not provide insight into the origins or appropriateness of the making, validity, or enforcement test. Since then, the Appellate Court has applied this test in numerous foreclosure actions.

[11] "There have been many and varied interpretations of the making, validity and enforcement requirement by Connecticut Superior Court decisions. There is a line of cases which interprets the phrase very strictly to mean the execution and delivery of an enforceable instrument, and not the occurrences that may arise between the parties during the course of their loan relationship. . . . A second line of cases, however, interprets the making, validity, and enforcement requirement less rigidly. . . . This court does not subscribe to the literal, chronological test of making, validity and enforcement . . . . [P]ostexecution actions or positions of a lender can relate to the enforcement of a note and mortgage. Each counterclaim or special defense therefore requires a case-by-case analysis, by the court acting as a court of equity, to assess the extent to which the facts alleged relate to the original transaction and not to any different or subsequent transaction." (Citations omitted; internal quotation marks omitted.) *Bank of America, N.A.* v. *Groton Estates, LLC*, Docket No. CV-09-6001697-S, 2010 WL 3259815, *5 (Conn. Super. July 13, 2010); see also *U.S. Bank National Assn.* v. *Blowers*, supra, 177 Conn. App. 648 n.7 (*Prescott, J.*, dissenting) ("I recognize that our jurisprudence is somewhat opaque with regard to the meaning of enforcement in this context and that there can be reasonable and differing views about how to interpret that term in the foreclosure context. For example, enforcement could be construed narrowly to refer only to the ability of a mortgagee to enforce the note or mortgage or, more broadly, to include a mortgagee's actions related to such enforcement.").

[12] Although the dissenting Appellate Court judge relied in part on a distinction between defenses at law and defenses in equity as a basis for a more expansive meaning of enforcement for the latter; *U.S. Bank National Assn.* v. *Blowers*, supra, 177 Conn. App. 644 (*Prescott, J.*, dissenting); our focus in the present case is on equitable defenses. As such, we have no occasion to address whether legal defenses would be subject to the same broad view.

[13] Diane E. Thompson, then counsel for the National Consumer Law Center, explains the financial incentives for a mortgage servicer to draw out a delinquency without a modification or a foreclosure. See D. Thompson, "Foreclosing Modifications: How Servicer Incentives Discourage Loan Modifications," 86 Wash. L. Rev. 755 (2011). According to Thompson, servicers' "income stream comes primarily from their monthly servicing fee, which is a fixed percentage of the outstanding principal balance." Id., 767. Servicers face competing incentives when deciding whether to offer a modification or proceed with foreclosure. Id., 776–80. She posits that "the true sweet spot lies in stretching out a delinquency without either a modification or a foreclosure. While financing advances is a large expense for servicers, one they will want to end as soon as possible, late fees and other [default related] fees can add significantly to a [servicer's] bottom line, and the longer a homeowner is in default, the larger those fees can be. The nether-world status between a foreclosure and a modification also boosts the monthly servicing fee (because monthly payments are not reducing principal) and slows down servicers' largest [noncash] expense: the amortization of mortgage servicing rights (because homeowners who are in default are unlikely to prepay via refinancing). Finally, foreclosure or modification, not delinquency by itself, usually triggers loss recognition in the pool under the accounting rules. Waiting to foreclose or modify postpones the day of reckoning for a servicer." (Footnotes omitted.) Id., 777. "Servicers do not make binary choices between modification and foreclosure. Servicers may offer temporary modifications, modifications that recapitalize delinquent payments, modifications that reduce interest, modifications that reduce princi-

pal, or combinations of all of the above. Servicers may demand upfront payment of fees or waive certain fees. Or servicers may simply postpone a foreclosure, hoping for a miracle. Once a servicer chooses a modification, the servicer must further choose between types of modifications. Servicers will often, if they can, choose a short-term forbearance or repayment agreement over a permanent modification of the loan terms. A permanent modification of the loan terms might involve capitalizing arrears, extending the term, reducing the interest, and reducing or merely forbearing the obligation to repay principal. . . . [T]he weight of servicer incentives is always against principal reductions and weighs heavily in favor of short-term agreements. Principal reductions cut into the servicer's main source of income—the monthly [principal based] servicing fee—without offering any additional income. Short-term modifications delay loss recognition and preserve cash flow to the residual interests held by many servicers. Interest rate reductions are only slightly more favorable from a servicer's standpoint than principal reduction or forbearance: they will still, ultimately, result in a drop in the principal as borrowers pay down principal more quickly over time at a lower interest rate. While the incentives are mixed for a foreclosure, there are more incentives in favor of a foreclosure than against." (Footnote omitted.) Id., 780.

[14] The trial court found that the defendant's allegations that the plaintiff's misleading conduct was calculated to induce the defendant to believe that he was going to get a loan modification and that the defendant acted on the information provided by making payments under the May, 2012 modification were legally sufficient to satisfy the elements of equitable estoppel. The court did not explain why it distinguished the May, 2012 modification from the other modifications previously offered and withdrawn. The court also found that those same allegations, as well as further allegations that the plaintiff conducted itself in wilful or reckless disregard of the harmful consequences of its solicitations and that it failed to conduct itself in an honest and equitable manner were legally sufficient to establish the elements of an unclean hands defense.

[15] The defendant alleged that the Department of Banking "intervened on [his] behalf, resulting in an immediate modification being received." We agree with Judge Prescott that, in light of the liberal construction that the trial court was required to give the pleadings, the defendant's allegations were sufficient to support a claim that a binding modification had been reached prior to the commencement of the foreclosure action. As such, the defendant's pleadings should not have been stricken in their entirety on that basis alone.

[16] The only distinction that has been made focuses on allegations of conduct during the course of court-supervised mediation. The plaintiff suggested at oral argument before this court that statutory sanctions are the proper remedy to address misconduct during mediation. The mediation scheme acknowledges "an expectation" that the parties will participate in the mediation process "in good faith, but without unreasonable and unnecessary delays" in an effort to reach an agreement to avoid foreclosure or to expedite or facilitate the foreclosure with reasonable speed and efficiency. General Statutes § 49-31k (7). It authorizes the court to impose sanctions on any party or counsel for engaging in "intentional or a pattern or practice of conduct during the mediation process that is contrary to the objectives of the mediation program" and provides that available sanctions "shall include, but not be limited to, terminating mediation, ordering the mortgagor or mortgagee to mediate in person, forbidding the mortgagee from charging the mortgagor for the mortgagee's attorney's fees, awarding attorney's fees, and imposing fines." General Statutes § 49-31n (c) (2).

The present case involves an alleged pattern of misconduct that commenced long before the filing of the foreclosure action and continued during mediation. We have no occasion, therefore, to consider whether the availability of those sanctions reflects a legislative intent to occupy the field when the misconduct is limited to the mediation period. Moreover, the plaintiff has provided no analysis on the issue of whether the legislature intended these sanctions to supplant or otherwise limit the court's inherent power to impose sanctions or otherwise afford equitable relief. Cf. *Mingachos* v. *CBS, Inc.*, supra, 196 Conn. 109–10 ("[b]ecause the [Workers' Compensation Act] provides the exclusive remedy to the employee for conduct alleged in the original complaint, the trial court's denial of the plaintiff's motion to strike the special defense was not clearly erroneous").

[17] A litigation hold is placed on the case, during which time a mortgagee is prohibited from making any motion, request or demand of a mortgagor,

except as it may relate to the mediation program; General Statutes § 49-31*l* (c) (6); and no judgment of strict foreclosure or foreclosure by sale may be rendered against the mortgagor during the mediation period. General Statutes §§ 49-31*l* (c) (6) and 49-31n (c) (9).

———————————————